ATTORNEYS FOR APPELLANT
Stephen T. Owens
Public Defender of Indiana

Thomas C. Hinesley
Laura L. Volk
Deputy Public Defenders
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE
Gregory F. Zoeller
Attorney General of Indiana

James B. Martin
Deputy Attorney General
Indianapolis, Indiana

### In the
# Indiana Supreme Court



No. 74S00-0907-PD-320

ROY LEE WARD,

*Appellant (Petitioner below)*,

v.

STATE OF INDIANA,

*Appellee (Respondent below)*.

Appeal from the Spencer Circuit Court, No. 74C01-0107-CF-158
The Honorable Robert J. Pigman, Special Judge

On Direct Appeal

**June 21, 2012**

**Sullivan, Justice.**


Roy Lee Ward appeals the denial of his petition for post-conviction relief from his sentence of death. We affirm the post-conviction court's decision for the reasons set forth in this opinion.

**Background**

This petition for post-conviction relief follows Ward's second trial during which he pled guilty to the 2001 rape and murder of fifteen-year-old Stacy Payne.[1] Ward was sentenced to death following a penalty-phase jury trial. We earlier affirmed Ward's sentence on direct appeal. Ward v. State, 903 N.E.2d 946, aff'd on reh'g, 908 N.E.2d 595 (Ind. 2009), cert. denied, 130 S. Ct. 2060-61 (2010). Ward subsequently sought to have his death sentence set aside by filing a petition for post-conviction relief as permitted by Indiana Post-Conviction Rule 1. The post-conviction court denied relief, and Ward now appeals.

**Discussion**

Ward raises a number of issues in his petition for post-conviction relief, and we consider each in turn. This opinion proceeds in seven parts: Part I reviews the law governing post-conviction relief and ineffective-assistance-of-counsel claims. Part II addresses Ward's claims that his trial counsel were ineffective in their mitigation investigation and presentation. Part III addresses Ward's claims that his trial counsel were ineffective in failing to challenge certain aspects of the State's case. Part IV addresses Ward's ineffective-assistance-of-appellate-counsel claims. Part V addresses Ward's ineffective-assistance-of-counsel claims under United States v. Cronic, 466 U.S. 648 (1984). Part VI addresses Ward's claims that the Indiana Death Penalty Statute violates the Eighth Amendment. Finally, Part VII addresses Ward's claim under Napue v. Illinois, 360 U.S. 264 (1959).

**I**

By and large, completion of Indiana's direct appellate process closes the door to a criminal defendant's claims of error in conviction or sentencing. However, our law allows individuals

---

[1] His first jury trial resulted in guilty verdicts for murder, rape, and criminal deviate conduct, followed by a penalty-phase jury trial that resulted in the death sentence. On direct appeal to this Court, however, his convictions and sentence were reversed due to prejudicial pretrial publicity. Ward v. State, 810 N.E.2d 1042 (Ind. 2004), cert. denied, 546 U.S. 926 (2005).

whose appeals have been unsuccessful to raise a narrow set of claims through a collateral review procedure called "post-conviction relief." See Ind. Post-Conviction Rule 1(1). The scope of the relief available is limited to "'issues that were not known at the time of the original trial or that were not available on direct appeal.'" Pruitt v. State, 903 N.E.2d 899, 905 (Ind. 2009) (quoting Allen v. State, 749 N.E.2d 1158, 1163 (Ind. 2001)). Issues available on direct appeal but not raised are waived, while issues litigated adversely to the defendant are res judicata. Id.

A court that hears a post-conviction claim must make findings of fact and conclusions of law on all issues presented in the petition. See P-C.R. 1(6). The findings must be supported by facts and the conclusions must be supported by the law. Pruitt, 903 N.E.2d at 905; see also Allen, 749 N.E.2d at 1164. Our review on appeal is limited to these findings and conclusions.

Because the petitioner bears the burden of proof in the post-conviction court, see P-C.R. 1(5), an unsuccessful petitioner appeals from a negative judgment. A petitioner appealing from a negative judgment must show that the evidence as a whole "'leads unerringly and unmistakably to a conclusion opposite to that reached by the trial court.'" Pruitt, 903 N.E.2d at 905 (quoting Allen, 749 N.E.2d at 1164). This means that "'[we] will disturb a post-conviction court's decision as being contrary to law only where the evidence is without conflict and leads to but one conclusion, and the post-conviction court has reached the opposite conclusion.'" Id. (alteration in original) (quoting Allen, 749 N.E.2d at 1164).

Many of Ward's claims are grounded in his contention that he did not receive the minimum level of effective assistance from his counsel that the Constitution requires. We analyze such claims under the two-part test announced in Strickland v. Washington, 466 U.S. 668 (1984). Under this test, Ward must show (1) that counsel's performance was deficient based on prevailing professional norms; and (2) that the deficient performance prejudiced the defense. Id. at 687; see also Pruitt, 903 N.E.2d at 905-06; Bivins v. State, 735 N.E.2d 1116, 1121 (Ind. 2000).

As for the first component of an ineffective-assistance claim – counsel's performance – we have observed that "'[c]ounsel is afforded considerable discretion in choosing strategy and tactics, and we will accord that decision deference. A strong presumption arises that counsel

3

rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.'" Pruitt, 903 N.E.2d at 906 (alteration in original) (quoting Lambert v. State, 743 N.E.2d 719, 730 (Ind. 2001)).

And as for the second prong, the U.S. Supreme Court has held that in most circumstances, deficient performance of counsel will be prejudicial when "'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" Rompilla v. Beard, 545 U.S. 374, 390 (2005) (quoting Strickland, 466 U.S. at 694). "'A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" Wiggins v. Smith, 539 U.S. 510, 534 (2003) (quoting Strickland, 466 U.S. at 694). In assessing prejudice in the context of a claim of an inadequate mitigation investigation, we consider "'the totality of the available mitigation evidence – both that adduced at trial, and the evidence adduced in the [post-conviction proceeding] – and 'reweig[h] it against the evidence in aggravation.'" Porter v. McCollum, 130 S. Ct. 447, 453-54 (2009) (per curiam) (second alteration in original) (quoting Williams v. Taylor, 529 U.S. 362, 397-98 (2000)).

## II

Ward's first claim is that he is entitled to post-conviction relief because his trial counsel were ineffective in investigating, preparing, and presenting evidence in mitigation of the death penalty. Specifically, he argues that trial counsel (a) failed to conduct an adequate mitigation investigation; (b) failed to have him evaluated by appropriate mental health experts in a timely and comprehensive manner; (c) failed to present certain mitigation testimony from lay witnesses that were called at trial; and (d) failed to inform the jury that his guilty plea was a mitigating circumstance. Although his arguments overlap to some degree, we consider each of them separately.

## II-A

Ward claims that trial counsel were ineffective in their mitigation investigation. He argues that a "comprehensive investigation would have led to a much fuller and more mitigating penalty phase presentation that would have yielded a reasonable probability of a sentence less than death," Appellant's Br. 11, and cites evidence presented at the PC hearing to support his claim. Related to this, he argues that the mitigation investigator's "inability to complete the social history crippled the defense preparation." Id. at 13.

## II-A-1

The PC court concluded that Ward had failed to establish deficient performance or prejudice in this regard, and it made findings of fact to support its conclusion.

First, the PC court found that "trial counsel made the efforts necessary to learn all relevant and probative information about Ward and his background to present a thorough, if not winning, mitigation presentation." PCR App. 324. Moreover, it found that based on the evidence offered at the PC hearing and considering that they were successful in appealing his first trial, Ward's trial counsel were "aware of any character or background evidence that could have been presented and made reasonable strategic choices about what mitigation to present." Id. It found that trial counsel had presented testimony from Ward's mother, his grandmother, his brother, his former brother-in-law, his half-brother by his father, a former employer, a former sexual partner, his former probation officer, and a former friend to give the jury lay-witness background information about Ward's life. Id. The PC court generally concluded that the evidence presented at the PC hearing was "either cumulative of what was presented at trial or otherwise had no capacity to materially improve the mitigating quality of [Ward's] case." Id. at 324-25.

With regard to the mitigation investigator's performance, the PC court found that although she was experiencing personal problems while working on Ward's case, "the defense was

5

able to get what it was looking for." Id. at 324. And although the investigator was unable to complete a social history as requested, trial counsel testified that she had given her expert "'[a]ll the police reports that had to do with the public indecency charges as well as all the probation records, education records, any sort of record that has anything to do with any prior mental health treatment evaluation of whatever.'" Id. (alteration in original) (quoting PCR Ex. 37, at 46).

Lastly, the PC court found that there was "no relevant probative evidence of mitigation presented in the first trial that was not presented in Ward's retrial, leaving the Court to conclude that the supposed lack of any information gained from the previous mitigation expert was sufficiently remedied by resort to other sources of information." Id. at 325.

**II-A-2**

The record corroborates most of these findings and ultimately supports the PC court's conclusion that Ward did not receive ineffective assistance of counsel in this regard.

The record shows that Ward's trial counsel, Lorinda Youngcourt and Steve Ripstra, indeed faced some difficulties in their mitigation investigation. At the PC hearing, trial counsel testified that they received everything that had been prepared for mitigation in Ward's first trial, PCR Tr. 49-50, 408-10, but because that mitigation file was rather small, they basically had to start from scratch, id. at 410. They retained a mitigation investigator, Michelle Rushton (formerly Michelle Perry or Michelle Delph), in November, 2005, id. at 295, but by mid-August, 2006, Rushton's investigation was only a little more than a third complete, see Trial II Tr. 91 (hearing on motion to continue trial). No one on the defense team did much mitigation work during the fall of 2006 after the original trial judge recused himself. Thus, by early January, 2007, when Judge Pigman set the trial date for early May, 2007, the mitigation investigation still "wasn't anywhere near complete." PCR Tr. 300-01. Moreover, because she was struggling both professionally and personally during that time, id. at 301-02, the social history Rushton submitted to trial counsel was incomplete, id. at 306. In fact, because of the problems they were

6

having with Rushton,[2] Judge Pigman allowed trial counsel to hire another mitigation investigator in March, 2007. Id. at 48-49, 305. That additional mitigation investigator, however, apparently abandoned the case after only one day. Id. at 456.

Yet despite these difficulties, there is evidence of a thorough mitigation investigation performed in this case. Although Rushton was slow in getting them information, trial counsel Ripstra testified that "[Rushton] was providing us with the information we wanted." Id. at 48. Rushton testified at a pretrial hearing on August 21, 2006, that most of the records had already been gathered, Trial II Tr. 91, although testimony offered at the PC hearing suggests that trial counsel were still gathering some records in the spring of 2007. PCR Tr. 440, 483.[3] Moreover, trial counsel Youngcourt testified at a post-trial hearing that she had sent one of her mental health experts "[a]ll the police reports that had to do with the public indecency charges as well as all the probation records, education records, any sort of record that had anything to do with any prior mental health treatment evaluation of whatever." PCR Ex. 37, at 46.[4] And we note that according to testimony offered on behalf of Ward at the PC hearing, such records are just as important to the mitigation investigation as a document called "social history." PCR Tr. 510-11. Notwithstanding the absence of a completed social history, Youngcourt prepared a three-page summary about Ward based on his first trial, Youngcourt's personal conversations with him, and his records; she gave this document to her mental health experts before they met with Ward in late-March, 2007. Id. at 447-48.

Further, the mitigation investigation consisted of interviewing many people. Rushton testified that she met with Ward twice and that she had quite a bit of contact with his mother. Id. at 302. For her part, Youngcourt testified that she saw Ward once a month or once every other month and that she had been representing Ward since 2003. Id. at 458-59. Rushton further testified that she interviewed approximately a dozen lay witnesses for about an hour or an hour-and-

[2] Youngcourt testified that her failure to supervise Rushton was one of her "biggest short comings in this case." PCR Tr. 407-08.

[3] Trial counsel testified that they received the records of Dr. Engum, an expert from Ward's first trial, "fairly late in the day," PCR Tr. 440, and records from Central State Hospital "[v]ery late in the day," id. at 483.

[4] And that mental health expert, Dr. Friedman, testified at the post-trial hearing that he had spent 50.5 hours reviewing the file and records provided to him, PCR Ex. 37, at 32-33, suggesting that the file and records were quite extensive.

a-half each and wrote a report of what she discovered for each interview. Id. at 310-11. Ward's trial counsel then divided up the mitigation witnesses and one or the other saw each of them personally; they then decided who would be called for trial based on the productivity of their testimony. Id. at 56. As a result, they called to testify Ward's paternal grandmother, Trial II Tr. 1636-46; his mother, id. at 1646-1710; his brother, id. at 1711-21; his half-brother by his father, id. at 1770-79; his former case manager at the Indiana State Prison, id. at 1723-26; his current case manager at the Indiana State Prison, id. at 1726-29; his former juvenile probation officer, id. at 1989-97; his former girlfriend, id. at 1730-40; a former friend/employer, id. at 1740-48; another former employer, id. at 1760-69; his ex-wife, id. at 1748-59; and his ex-brother-in-law, id. at 1779-88. Trial counsel also called James Aiken, a prison consultant, who testified that based on 35 years' experience in the field, Ward could be "safely managed in a high security setting for the remainder of his life without causing an undue risk of harm to staff, inmates, as well as to [the] general public." Id. at 2011-12. Three mental health professionals, one of whom treated Ward in the late 1980s to early 1990s for exhibitionism, also testified on behalf of the defense. Id. at 1789-1832 (Dr. Joseph Edwards); id. at 1832-81 (Dr. George Parker); id. at 1884-1989 (Dr. Alan Friedman).

But contrary to the PC court's finding, our review of the record suggests that trial counsel were unaware of some background or character evidence that could have been presented. Testimony presented at the PC hearing indicates that there was some evidence of Ward possessing more redeeming traits, and that Youngcourt would have presented that evidence if she had been aware of it. For example, Ward's grandmother, who also testified at his second trial,[5] testified in an affidavit that Ward had helped her with yard work after Ward's grandfather passed away; that "[h]e was always willing to help"; that he would buy her gifts; and that he was a "lovely and friendly kid." PCR Ex. 25. Ward's uncle also testified in an affidavit that Ward would help others with yard work and other outdoor manual labor. PCR Ex. 26. Finally, the mother of one of Ward's ex-girlfriends, Trena Andrews, testified in an affidavit that Ward was a nice, polite

---

[5] Ward's grandmother, Margaret Ward, testified at Ward's second trial mostly about their family's history (marriage, education, health, etc.) and about Ward's exposing himself to her when he was young. Trial II Tr. 1636-46.

young man who was always eager to help.[6] PCR Ex. 27. Youngcourt testified that, had she known about the information contained in these affidavits, she would have presented it. PCR Tr. 466-68.[7]

Our review of the record also indicates that trial counsel intended in their investigation to discover certain things but never followed up. Specifically, they intended to but never contacted one witness in particular, Judge Jerome Jacobi, who had represented Ward on a series of public indecency charges in the early 1990s while in private practice. PCR Ex. 23, at 7-10. In a deposition admitted at the PC hearing, Judge Jacobi testified that Ward was very polite and cooperative and that Ward appeared to be remorseful and ashamed by his acts of public indecency. Id. at 12-14, 44. Trial counsel also wanted to investigate Ward's grandfather's military records to add credibility to those witnesses who suggested that Ward's grandfather also suffered from exhibitionism. PCR Tr. 474. Thus, the PC court's finding that trial counsel made reasonable strategic decisions about what mitigation evidence to present is not fully supported by the record on these matters.

Finally, with regard to the PC court's final finding on this issue, there was some mitigating evidence presented at the first trial that was not presented at the second. In particular, Ward points to evidence of certain stress factors that he faced in the days preceding the murder that were presented as mitigation in the first trial but not in the second. Appellant's Br. 35, 37-38. Youngcourt testified that she knew about Ward's activities preceding the murder and that Ward was under certain stressors but that she did not present that evidence to the jury and had no reason not to do so.[8] PCR Tr. 477-78.

---

[6] Moreover, Andrews testified that Ward's father would make inappropriate sexual references in front of his children, and this, according to trial counsel Youngcourt, was the most important information in Andrews's affidavit. PCR Tr. 468.

[7] Three other affidavits of Ward's family's neighbors were also presented at the PC hearing, but the PC court found that they were not admissible. PCR Tr. 469-73. These affidavits contain more information that Ward was a helpful, thoughtful young man. See PCR Ex. 28 (Affidavit of Loretta Bodi); PCR Ex. 29 (Affidavit of Russell Knieriem); PCR Ex. 30 (Affidavit of Juanita Knieriem). Ward makes no argument that these affidavits should have been admitted.

[8] On the other hand, Youngcourt explained at the PC hearing that one of those activities had to do with Ward having parked his car in front of some professional business, maybe a stock investment business. PCR Tr. 477. Along with the other activities and stressors, she stated that she had no reason not to present that evidence to the jury. Id. at 478. But our review of the trial record reveals that Youngcourt ex-

Our review of the record does not lead us to an opposite conclusion than that reached by the PC court, that Ward's trial counsel did not perform deficiently in their mitigation investigation.

"The Constitution requires that the trial counsel in capital cases conduct a <u>reasonable</u> investigation into potential mitigating factors." <u>Wallace v. Davis</u>, No. IP 95-0215-C-B/S, 2002 U.S. Dist. LEXIS 22353, at *93 (S.D. Ind. Nov. 14, 2002) (emphasis added) (citations omitted), <u>aff'd</u>, 362 F.3d 914 (7th Cir. 2004). What is reasonable depends on the circumstances of each case, including the facts of the crime, information gleaned from the defendant and others, and other readily available sources of information. <u>Id.</u> It does not demand a "'scorch-the-earth strategy.'" <u>Id.</u> (citations omitted). Moreover, "<u>Strickland</u> does not require counsel to investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant at sentencing." <u>Wiggins v. Smith</u>, 539 U.S. 510, 533 (2003).

Although Ward's trial counsel failed to discover some arguably mitigating evidence, they nevertheless conducted a reasonable investigation, thereby passing constitutional muster. Trial counsel's conduct here does not rise to anywhere near the level of inadequacy as that in other cases where the U.S. Supreme Court has found counsel's investigation to be deficient. In <u>Williams v. Taylor</u>, for example, trial counsel did not begin their investigation until a week before trial; failed to uncover records describing Williams's nightmarish childhood because they incorrectly thought that state law barred access; failed to discover or introduce evidence that Williams was borderline mentally retarded or that he had received prison commendations; and failed to follow up with a CPA who offered to testify that he had visited Williams frequently in prison as part of a prison ministry program, that Williams thrived in prison, and that Williams was proud of his carpentry degree earned in prison. 529 U.S. 362, 395-96 (2000). In <u>Wiggins</u>, trial counsel's inattention led them to abandon "their investigation of [Wiggins's] background after having

pressly stated that she had no intention of presenting any evidence that Ward had been parked, just sitting in his car, in front of an Edward Jones Investment Firm earlier in the day that Stacy Payne was murdered. Trial II Tr. 1431.

10

acquired only rudimentary knowledge of his history from a narrow set of sources," 539 U.S. at 524 – sources that revealed obvious bases of mitigating evidence that would have led any reasonably competent attorney to investigate further, id. at 524-26. In Rompilla v. Beard, trial counsel failed to examine the court file on Rompilla's prior convictions despite the fact that they knew that the prosecution planned to seek the death penalty by proving Rompilla had a significant history of felony convictions. 545 U.S. 374, 383-86 (2005). In Porter v. McCollum, trial counsel did not interview any witnesses or gather any records and thereby failed to uncover any evidence of Porter's mental health or mental impairment, his family background, or his military service. 130 S. Ct. 447, 453 (2009) (per curiam). And in Sears v. Upton, trial counsel failed to uncover horrific aspects of Sears's family and social life, that he was learning disabled, and that he suffered frontal lobe abnormalities that resulted in substantial cognitive deficits. 130 S. Ct. 3259, 3262-64 (2010) (per curiam) (5-4).

Unlike these cases, it is clear from the record here that trial counsel conducted a reasonable mitigation investigation. They interviewed Ward, his family members,[9] and others who knew him to gain insight into his background and to develop his history; they also gathered records related to his education, his time in prison, and his mental health. Using the ABA standards as a guide, we think that the scope of counsel's investigation was reasonable. See ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases 10.7 cmt. (rev. ed. 2003) (noting that among the topics counsel should explore are medical history, family and social history, religious and cultural influences, educational history, military service, employment and training history, and prior adult and juvenile correctional experience); see also Bobby v. Van Hook, 130 S. Ct. 13, 16-17 (2009) (per curiam) (restatements of professional standards can be useful guides as to what is reasonable); cf. Nix v. Whiteside, 475 U.S. 157, 165 (1986) (cautioning courts not to "constitutionalize particular standards of professional conduct"). And although they may have wanted to uncover certain mitigating evidence or may have intended to interview one potential mitigation witness in particular, they were not constitutionally defi-

---

[9] Ward does not argue that trial counsel were ineffective in failing to contact his sister, Wanda, who was estranged from Ward's family and possibly living in Germany. Nevertheless, we note that Ward did interview Wanda's ex-husband (Ward's ex-brother-in-law). Trial II Tr. 1779-88. Moreover, PC counsel did not present testimony from Wanda either, and the one PC expert who talked to Wanda during the week of Ward's PC hearing stated that she had "[l]ittle if any" beneficial information to add. PCR Tr. 379.

cient for failing to do so on this record. Cf. Yarborough v. Gentry, 540 U.S. 1, 8 (2003) ("[E]ven if an omission is inadvertent, relief is not automatic. The Sixth Amendment guarantees reasonable competence, not perfect advocacy judged with the benefit of hindsight." (citations omitted)). Ward's trial counsel simply did not make "errors so serious that [they were] not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Strickland, 466 U.S. at 687.

## II-B

Next, Ward claims that trial counsel were ineffective in selecting and preparing the mental health experts utilized at trial. He explains that the problem was not that trial counsel made no effort to secure expert assistance, but rather that "the mental health experts were ill-suited for this case, retained late, and provided necessary background information to inform their opinions even later." Appellant's Br. 15. Like that discussed supra, he claims that "[h]ad there been a functioning mitigation specialist capable of providing Ward's experts with a comprehensive social history, the jury would have been presented with the totality of Ward's background and mental illness." Id. at 34. And related to these claims, Ward also argues that trial counsel were ineffective for failing to secure rulings on motions for expert assistance and on a certain motion for a continuance based on the mitigation investigator having not yet completed a social history.

## II-B-1

The PC court concluded that Ward failed to establish either deficient performance or prejudice with respect to these claims, and it made findings of fact to support its conclusion.

First, the PC court concluded that "trial counsel thoughtfully selected experts and thoroughly and reasonably selected a strategy for presenting mitigation." PCR App. 312. It referenced the transcript of a hearing held to address a post-trial request for additional payment for one of the defense's mental health experts, Dr. Friedman. At the hearing, Dr. Friedman testified that it was trial counsel "Youngcourt's idea to pursue psychopathy as a theory of mitigation upon Dr. Friedman's advisement that Ward was a primary psychopath." Id. at 313 (citing PCR Ex. 37, at 17-18). Dr. Friedman explained that he believed psychopathy to be a mitigating circumstance

12

because of his belief that "'people do not volunteer to be born, you know, to be constitutionally deficient in feeling states.'" Id. (quoting PCR Ex. 37, at 24). For her part, Youngcourt testified at this hearing that she had provided Dr. Friedman with all the experts' testimony from Ward's first trial and all the records that had to do with Ward's prior mental-health-treatment evaluation. Id. The court found that Youngcourt had consulted with her experts to develop collectively the mitigation presentation and had explained that the mitigation theory originated in the course of a conference call involving Doctors Friedman and Parker as well as Professor Marla Sandys, who had been acting as a consultant regarding jury selection. Id. at 313-14. As a result, the PC court found that trial counsel had performed professionally and competently. Id. at 314.

Moreover, the PC court did not find significant qualitative differences between the expert opinions offered at the PC hearing and those offered at trial. Id. At trial, Dr. Parker testified that his multi-axial diagnosis of Ward was Axis I: exhibitionism; and Axis II: antisocial personality disorder. Id. at 315. He explained that Ward suffered from a subset of personality disorder called "psychopathy" and that both genetics and environment play a role in psychopathy, but that genetics plays a bigger role than people think. Id. at 315-16. Ward's other expert at trial, Dr. Friedman, also testified that Ward was a psychopath and explained to the jury that Ward's "'psychopathy stops him from conforming his conduct.'" Id. at 316 (quoting Trial II Tr. 1920-21). Ward had been "'tested out the kazoo,'" and because of that, Dr. Friedman testified that "'[Ward] is what he is. I don't need more test data.'" Id. (quoting Trial II Tr. 1932).

The PC court then summarized the expert opinions offered by Ward at the PC hearing. It explained that Dr. Fabian's "diagnostic conclusions were that Ward had extreme mental emotional disturbances and cited to: (1) exhibitionism; (2) depression; (3) ADHD; (4) learning disability; and (5) mixed personality." Id. at 318 (citation omitted). His primary diagnoses of Ward, however, were exhibitionism and antisocial personality disorder. Id. Ward's other post-conviction expert, Dr. Ferraro, rendered diagnoses of anxiety disorder not otherwise specified, exhibitionism, learning disorder, and antisocial personality disorder. Id. at 319. Dr. Ferraro endorsed Dr. Fabian's observations regarding ADHD and learning disabilities and also pointed to disciplinary issues at home that encouraged Ward's wrongful behavior. Id. at 320. Dr. Ferraro acknowledged that Ward's trial experts had observed and described problems with attachment,

13

and he agreed with Dr. Parker's trial testimony that both genetics and environment play a role in personality disorder. Id. at 320-21. Of note to the PC court was Dr. Ferraro's belief that Ward murdered Stacy Payne in a fit of rage; it found that "[n]o other expert, in Ward's first trial, in the trial challenged in these proceedings, or other post-conviction experts, has expressed an opinion that Ward killed Stacy Payne out of rage." Id. at 322. Both Doctors Fabian and Ferraro acknowledged their consensus with the trial experts that Ward suffered from antisocial personality disorder. Id. at 319, 321.

After summarizing all the testimony,[10] the PC court concluded:

> Among all of these experts, those offered at trial and those offered at post-conviction, a consensus emerges that Ward lacks empathy for others and will hurt others to advance his personal well being. The only discernable distinction noted by the Court is that Doctors Fabian and Ferraro would place more responsibility for Ward's personality development in this respect on Ward's upbringing and environment, while the experts offered a trial tended to opine that Ward's antisocial personality is more greatly attributable to genetic, biological and immutable psychological makeup. Given the facts of the murder in this case and the lack of any other evidence to suggest that Ward was unable to appreciate the circumstances or the wrongfulness of his conduct when [he] raped and murdered Stacy Payne, the distinction that comes through the testimony of the trial experts can be seen as strategically superior. The Court finds that testimony like that offered by Dr. Fabian and Dr. Ferraro would not have created a reasonable probability of a different outcome. The dominant features of Ward's makeup as it relates to this case are his antisocial personality and his total lack of remorse. Ward has failed to show prejudice with respect to this claim.

Id. at 323-24.

---

[10] The PC court also summarized the testimony of Dr. Edwards who had treated Ward for exhibitionism in the late 1980s and early 1990s and the testimony of the State's mental health expert presented at the PC hearing, Dr. Wood, who had evaluated Ward. The PC court found that Dr. Wood had also rendered Axis I diagnoses of exhibitionism and learning disability and an Axis II diagnosis of antisocial personality disorder. PCR App. 322. Dr. Wood disagreed that antisocial personality disorder is either biologically or genetically inherited, but rather explained that personality disorder is the person's identity. Id. Dr. Wood explained that, despite his upbringing, "Ward had the capacity to make choices about his behavior," and that "Ward would make choices in the manner best serving his personal preferences with no regard to any expense to others." Id. at 323 (citation omitted).

14

Finally, with regard to the mitigation investigator's failure to complete a social history and trial counsel's failure to secure a ruling on a motion for a continuance based on this, the PC court found that "trial counsel well apprised themselves of Ward's social background, including his family, medical, and educational history, as well as his criminal history," and that "there [was] no significant evidence before the Court suggesting that Ward's mental health experts at trial were not made aware of the pertinent information in this regard." Id. at 325. Instead, it found that both Doctors Fabian and Ferraro significantly referenced the materials relied upon by Doctors Parker and Friedman at Ward's penalty phase. Id. Thus, despite the mitigation investigator's failure to complete a formal social history, the PC court found that trial counsel were thorough in providing extensive information on Ward's background and social history to the trial experts, id., such that they had sufficient information "to render an opinion to a reasonable degree of scientific certainty as to his condition," id. at 327. The PC court also found Ward's claim that trial counsel were ineffective by failing to secure rulings on motions for expert assistance to be redundant in light of its findings on trial counsel's selection and use of experts for trial, as discussed supra. Id. at 326.

**II-B-2**

The record largely corroborates the PC court's findings of fact and ultimately supports its conclusions of law.[11]

At the outset, we note that the record supports the PC court's findings with regard to the social history and trial counsel's failure to secure a ruling on a motion for a continuance based on this. As we found in Part II-A, supra, there is evidence that trial counsel conducted a thorough mitigation investigation despite the mitigation investigator's having provided trial counsel with an incomplete social history. Further, the record reveals that both the trial experts and PC experts substantially relied on the same sources of information, including: Ward's family's history and lax discipline at home; his school records; his criminal and DOC records; and his hospitalization and medical records including records developed in the first trial, records from Life

---

[11] We discuss some of the trial experts' and PC experts' testimony in Part II-E, infra. To the extent we do not repeat certain aspects of their testimony here, we have considered them together with what is discussed in this section in reviewing the PC court's findings.

Springs, and records from Central State Hospital. And while the PC experts also referred specifically to Ward's Madison State Hospital records, PCR Tr. 236, it is reasonable to conclude that trial counsel Youngcourt provided those records to at least Dr. Friedman in light of her testimony that she had given him "any sort of record that had anything to do with any prior mental health treatment evaluation of whatever." PCR Ex. 37, at 46.

Nevertheless, our review does reveal one possible instance where the trial experts may have lacked some of Ward's family's medical records. Specifically, when asked whether Ward's mother or father had psychopathy or antisocial personality disorder, Dr. Friedman testified that he could not diagnose them because he did not review their medical records. Trial II Tr. 1965. The record reveals that both of the PC experts reviewed Ward's mother's mental health records.[12] It is not entirely clear, however, whether Dr. Friedman had access to records that would reveal psychopathy but did not review them or whether he simply did not have access to them. And in any event, the PC experts did not review Ward's father's mental health records (if any) either. See PCR Ex. 17, at 1-3 (Dr. Fabian's report listing sources of information); PCR Ex. 21, at 1-2 (Dr. Ferraro's report listing documents reviewed). Thus, we cannot say that it was clearly erroneous for the PC court to find no significant evidence of pertinent information of which Ward's trial experts were unaware. Moreover, even if Ward's mother's records were in fact not obtained, we note that PC counsel has not argued that trial counsel performed inadequately in not obtaining them.

Moving on, with regard to the PC court's findings on performance, the record supports that it was trial counsel Youngcourt's idea to pursue psychopathy as a mitigation strategy, PCR Ex. 37, at 17-18, although she testified later at the PC hearing that she was always a little concerned about it, PCR Tr. 450. Specifically, the idea developed during a conference call with Dr. Friedman, Dr. Parker, and the defense team's jury consultant. PCR Ex. 37, at 51-52. Youngcourt explained that their jury consultant, who had done a lot of research on the Indiana Death Penalty Statute, had suggested that psychopathy could be a mitigating circumstance, and it was one that they hoped could explain the evidence presented by the State in the first trial that

---

[12] As discussed in Part II-E, infra, Ward's mother testified at the second trial that she was on medication for depression, which affected her memory.

16

Ward showed absolutely no emotion on the day of the offenses. Id. at 51-53. The record reveals extensive efforts in developing psychopathy as a mitigation strategy, including Dr. Friedman's spending 50 hours reviewing articles and other research, synthesizing materials, and contacting other professionals about it. Id. at 13-21. In defending the reasonableness of the bill that he submitted for his services (which was about $58,000, id. at 31), Dr. Friedman explained that he knew that this "was going to be an uphill fight" and that he "wanted to be as thorough and diligent as possible to find things in the literature if they existed to help a jury understand [Ward's] condition of primary psychopathy." Id. at 24-25. And when asked whether she thought the bill was reasonable, Youngcourt explained:

> My honest, honest to God when I first saw it I had a little sticker shock but when I sat down and I actually thought about how much time I had spent with him on the telephone, I had arranged conference calls with Dr. Parker, Dr. Edwards and Dr. Friedman, I had at least two other hour long conference calls with just Dr. Parker and Dr. Friedman where they were trying to do exactly what I had hired them to do which was help me figure out how to make a defense out of the evidence that I had, when I thought about that and then I thought about all of the research articles he sent me and even on weekends when he couldn't get to the library or his data base he would e-mail me and I was pulling them off of Lexis Nexus [sic] and various places I know in my billing there's some bills for articles that I downloaded and I thought about all of that it appeared very reasonable to me because I know he was spending as much time on that portion of the case as I did, probably more.

Id. at 49-50.

Ward's trial counsel presented testimony from Dr. Parker and Dr. Friedman at the penalty-phase jury trial that took place on May 14-18, 2007 (jury selection was held on May 9 and May 11, 2007). Trial counsel filed a motion for funds to retain Dr. Parker on February 5, 2007, Trial II App. 463-65, which was granted by the trial court on March 1, 2007, id. at 597. Trial counsel Youngcourt had worked with Dr. Parker on another case where he had identified something about a defendant that no other expert had, and Youngcourt hoped that Dr. Parker would do the same in Ward's case. PCR Tr. 425-26. Dr. Parker conducted two in-person interviews of Ward in prison around March 26, 2007, id. at 444, and reviewed a variety of records (including Ward's medical records and records from the first trial). Trial II Tr. 1839. Ward freely admitted to Dr. Parker to always being a liar, to being very good at lying, and to doing it all the time. Id.

at 1843. Dr. Parker diagnosed Ward with exhibitionism and antisocial personality disorder, and specifically, a subset of antisocial personality disorder called psychopathy. Id. at 1840. He explained that, other than keeping Ward away from society, treatment for Ward's psychopathy was not really an option. Id. at 1873. According to Dr. Parker, psychopaths do not have a conscience, id. at 1846; they do not feel guilt or remorse (although they may feel other emotions), id. at 1846, 1855; and "[t]hey do what they need and that's all the justification that they need," id. at 1846. In talking with Ward, Dr. Parker explained that Ward had no emotional connection with what they were talking about (either about his exhibitionism or the murder), and in fact, that Ward has never really had a connection with other people at all. Id. at 1846-47, 1878-79. He explained that with antisocial personality disorder, part of it is environmental, but a big part of it is genetic,[13] and that in this case in particular, Ward was born without a conscience. Id. at 1847-49, 1857. He also explained that the brains of people with antisocial personality disorder are structured differently. Id. at 1849. Dr. Parker was not surprised that Ward showed no emotion on the day of the offenses because Ward has "no sense of other people as real beings." Id. at 1852-53. Moreover, Dr. Parker explained to the jury that they would not see much emotion from Ward during the trial. Id. at 1860. With regard to Ward's exhibitionism, Dr. Parker stated that there was a bit of a connection to his psychopathy because if he wanted to expose himself, he would. Id. at 1855. Finally, Dr. Parker testified that Ward would probably not be a danger to others in prison because he would be aware that he is not in control in prison. Id. at 1873-75.

Trial counsel also sought and was granted funds to retain Dr. Friedman on March 14, 2007. Trial II App. 656-62, 681. Dr. Friedman met with Ward on three occasions while Ward was in prison around March 28, 2007, PCR Tr. 451, performed a psychopathic checklist on him, and reviewed all the records he was given, Trial II Tr. 1891-92. Dr. Friedman explained that Ward had something "[v]ery much wrong with him," and he diagnosed Ward with severe psychopathy and exhibitionism. Id. at 1892, 1894. Psychopaths, according to Dr. Friedman, "have multiple deficits in their capacity to relate to people emotionally because they are so internally impoverished," id. at 1892-93, and therefore, they have a difficult time seeing people the same way as normal people see people, id. Ward even told Dr. Friedman that he does not feel any-

---

[13] On cross, Dr. Parker acknowledged that the "question . . . has not been fully answered" whether antisocial personality disorder was genetic or a result of environmental contributions. Trial II Tr. 1866.

thing. Id. at 1937. This is why Ward showed no emotion on the day of the offenses. Id. at 1903. Dr. Friedman also explained that psychopaths like Ward do not see themselves as having a future so they keep committing crimes. Id. at 1916. With regard to the cause of Ward's psychopathy, Dr. Friedman explained that Ward did not volunteer to be the way that he is, but rather that he was born with this temperament. Id. at 1911-12, 1966-67. Because Ward's psychopathy prevents him from conforming his conduct to the law and because he had psychopathic traits on the day of the offense, Dr. Friedman explained that Ward's psychopathy provides some kind of understanding as to how he could do something like this. Id. at 1920, 1931-32, 1956. Moreover, Dr. Friedman explained that, as a psychopath, Ward's brain functions differently in the way he processes and understands information, id. at 1893; that Ward has a need for stimulation, id. at 1906-08; and that he has poor behavioral controls, id. at 1938-39. Like Dr. Parker, Dr. Friedman explained that there was no real treatment for Ward at this time, other than keeping him in prison. Id. at 1944-45. Although he had been given the option of retesting Ward, Dr. Friedman explained that he did not need more test data and that he would rather spend his time interviewing Ward to get his history and to observe his emotional reactions (or lack thereof). Id. at 1932-33.

At the PC hearing, counsel presented testimony from Dr. Fabian and Dr. Ferraro. Dr. Fabian stated that his primary diagnoses of Ward were antisocial personality disorder and exhibitionism, PCR Tr. 276, and he acknowledged that there was a consensus among the experts who testified at Ward's second trial and at the PC hearing that Ward suffers from antisocial personality disorder, id. at 282. However, Dr. Fabian also concluded that Ward has ADHD, learning disability, depression, and borderline personality disorder. Id. at 254. Dr. Fabian explained that Ward was not born with antisocial personality, but rather his ADHD and learning disability put him at risk for developing antisocial personality disorder. Id. at 271-72. Like Dr. Friedman, Dr. Fabian stated that Ward had "been poked and prodded for years," id. at 221; that Ward knew something was wrong with him, id. at 236; and that Ward had problems connecting with other people, id. at 235. But, according to Dr. Fabian, Ward was a psychological challenge that could not be described by a simple label – a label like psychopath. Id. at 289-90. He also stated that Ward could be treated. Id. at 253. With regard to Ward's exhibitionism, Dr. Fabian explained that Ward had issues of volitional impairment and that he would flash people to reduce stress. Id. at 232. When asked about Ward's telling him (Dr. Fabian) that he felt sorry for the victim but

telling another expert that he did not, Dr. Fabian explained that Ward's feeling for Stacy Payne "is somewhat . . . conflicted within himself like his emotional makeup to some degree." Id. at 251.

Dr. Ferraro also testified at the PC hearing. He diagnosed Ward with anxiety disorder not otherwise specified; exhibitionism and learning disability by history; and antisocial personality disorder, id. at 353-54, and he acknowledged his consensus with other experts, id. at 371-72. He agreed with Dr. Parker and Dr. Friedman that Ward has difficulty relating to and connecting with others, id. at 335-36, and that he has "problems with empathy and caring and feeling towards people like other people normally do," id. at 329. When talking about his father, with whom Ward described as his closest relationship, Ward had "a complete lack of depth of relatedness" and a "[c]omplete absence of language or words or expressions of emotional presence or contact or closeness." Id. at 331. Dr. Ferraro explained that Ward would manipulate others to cope with his "intense loathing and feelings of inferiority," id., and also confirmed that Ward would change topics to avoid talking about things that did not serve his best interest, id. at 369-70. He stated that antisocial personality disorders are typically resistant to treatment and suggested that the best opportunity to treat Ward was missed when he was young. Id. at 354-55. Unlike Dr. Friedman, Dr. Ferraro explained that Ward's personality developed over time and that he was not born the way that he is, id. at 346-49, but he later agreed with Dr. Parker that both genetics and environment play a role in antisocial personality disorder, id. at 361-62. And similar to Dr. Fabian, Dr. Ferraro explained that Ward cannot be summed up in a label; that doing so would miss more than would be gained. Id. at 380.[14] Finally, with regard to remorse, Dr. Ferraro recounted a conversation with Ward where Ward explained that although he feels bad for Stacy's family, he does not feel the way that he should, and that, generally speaking, he does not have the same kind of remorse or feelings as other people. Id. at 357-59.

---

[14] With regard to the PC court's finding that Dr. Ferraro was the only expert who had suggested that Ward killed Stacy Payne out of a lifetime of suppressed rage, Ward points to a statement in Dr. Ferraro's report that Dr. Engum (an expert who testified at Ward's first trial) had also identified the presence and build up of intense suppressed anger that combined with other factors to lead to the death of Stacy Payne. See Appellant's Br. 29. While it is true that Dr. Engum's report refers to Ward having suppressed his anger for most of his life, we do not read Dr. Engum's testimony or report as expressly stating Dr. Ferraro's opinion that Ward murdered Stacy out of a fit of rage, and in any event, we do not view this finding to affect the outcome of this case, see Part II-E, infra.

20

After reviewing all this testimony, we conclude that, although the evidence is not unequivocal as to Ward's total lack of remorse, there is a substantial amount of evidence to support the PC court's finding of a consensus among the experts that Ward lacks empathy for others and is motivated by his own interests. However, in addition to the one distinction noted by the PC court that the trial experts placed more emphasis on biology and the PC experts placed more emphasis on environment, we note a few others. Specifically, the trial experts, while diagnosing Ward with antisocial personality disorder, also labeled Ward as a psychopath. The PC experts, although agreeing that Ward has antisocial personality disorder, did not refer to Ward as a psychopath and, in fact, stated that Ward could not be summed up by any sort of label. Moreover, while the trial experts testified that there was no real treatment for Ward at this time, at least one of the PC experts testified that Ward could be treated. Thus, we observe these differences in addition to the one noted by the PC court, but as discussed infra, we conclude that they do not affect the outcome.

**II-B-3**

Our review of the record does not lead us to an opposite conclusion than that reached by the PC court, that Ward's trial counsel did not perform deficiently in their selection and preparation of the mental health experts.

We recognize that Ward's claim essentially amounts to his view that trial counsel should have presented the expert testimony that was presented at the PC hearing and should not have pursued psychopathy as a mitigation defense. But we note that trial counsel made a strategic decision to pursue this defense pursuant to a thorough mitigation investigation, the challenge to which we upheld in Part II-A, supra. "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." Strickland, 466 U.S. at 690; see also Sears, 130 S. Ct. at 3265 (the reasonableness of the mitigation theory is related to the adequacy of the mitigation investigation). Contra Miller v. Webb, 385 F.3d 666, 675-76 (6th Cir. 2004) (decision to seat a biased juror cannot be strategic decision). We give deference to counsel's choice of strategy and tactics. Pruitt, 903 N.E.2d at 906.

21

At the PC hearing, trial counsel Youngcourt explained that she hoped "to provide the jury a label if nothing else, a diagnosis so that when they went back to deliberate they could say, you know, he's mentally ill," PCR Tr. 461-62 (emphasis added), and that is exactly what trial counsel did.[15] Although a diagnosis of antisocial personality disorder or, even worse, a finding of psychopathy, may have led some counsel to focus on another mitigation strategy, see Cullen v. Pinholster, 131 S. Ct. 1388, 1405-10 (2011) (finding no ineffectiveness in counsel's decision to evoke a family-sympathy mitigation defense in light of mental health expert's finding of psychopathic personality traits), even the mental health experts offered at the PC hearing focused on Ward's antisocial personality disorder as a mitigating factor. Further, we note that psychopathy has been viewed as a possible mitigating circumstance in at least one other jurisdiction with a death penalty statute that considers as mitigation whether the defendant was under the influence of mental or emotional disturbance or was unable to conform his or her conduct to the law. See State v. Caldwell, 388 S.E.2d 816, 823 (S.C. 1990) (evidence of psychopathic personality at time of offense supported statutory mitigating instructions pursuant to S.C. Code Ann. § 16-3-20(C)(b)(2), (6), and (7) under court's review in favorem vitae in effect at that time). While evidence of psychopathy might not have made Ward any more likable to the jury, it at least attempted to assist the jury in understanding him and to explain his horrendous acts and, even more so, his documented lack of emotion on the day of the offenses. See Sears, 130 S. Ct. at 3264 (evidence of personality disorder may not have made defendant any more likable, but it might have helped the jury understand him and his horrendous acts); Trial II Tr. 1318-19, 1402 (noting lack of emotion on day of offenses).

Nor was trial counsel deficient in selecting Ward's mental health experts or providing records to them. As reflected above, Ward's trial counsel retained their mental health experts about two months before the penalty-phase jury trial began. Even though neither of them was a so-called expert in sex-offender treatment, trial counsel did call to testify Dr. Edwards, who had actually treated Ward for his exhibitionism, and Dr. Parker offered some connection between Ward's exhibitionism and his psychopathy.[16] And while trial counsel Youngcourt suggested that

---

[15] There is evidence in the record that the jury did think that Ward had a mental illness. See PCR Tr. 475-77 (Youngcourt recounting encounter with jurors).

[16] Lending further support to our conclusion that trial counsel were not deficient in selecting mental health experts is the fact that unlike the experts presented at the PC hearing, the experts presented at trial

the trial experts' opinions of Ward may have been formed before they had all of his relevant information, PCR Tr. 429-31, and that she continued to send them records even after they had met with Ward, id. at 453, the PC record reflects that even PC counsel sent at least one of their mental health experts records after he had evaluated Ward, id. at 219-20.

We agree that trial counsel did not perform deficiently in selecting or preparing their mental health experts.

## II-C

Ward also contends that trial counsel were ineffective for failing to present mitigation testimony regarding the impact that Ward's execution would have on his family. The PC court concluded that Ward failed to establish either deficient performance or prejudice in this regard.

The PC court made findings to support this conclusion. First, it recounted some portions of both Ward's mother's and brother's testimony at the PC hearing regarding the effect that Ward's execution would have on them. It explicitly found to be untrue Ward's mother's statement that she would commit suicide if Ward were executed. PCR App. 336. Moreover, it found

> no evidence supporting any impact on Ward's family that would not be pertinent to the family of any other offender sentenced to be executed. There is no evidence that Ward played any caretaking or other role of responsibility in any family member's (or any other person's, for that matter) life. That said, whether to appeal to a jury's sense of sympathy with regard to the grief or sense of loss that the defendant's family might suffer is a strategic matter. Regardless, the Court finds that had trial counsel elected to present "execution impact" evidence, it would not have created a reasonable probability of a different outcome.

___

offered some compelling, albeit unsuccessful, reasons for why Ward should spend the rest of his life in prison as opposed to being sentenced to death. Dr. Parker explained that the worst situation for someone like Ward would be to spend day after day for the rest of his life in prison because he will have no control over what he does; it would be "torment for [Ward] to be in a prison setting for a long time with no attention other than the usual correctional officers and other inmates." Trial II Tr. 1860-61. And Dr. Friedman explained that psychopaths (like Ward) should be locked up and studied so that something like what happened in this case could be prevented in the future. Id. at 1943-45. Not only did trial counsel Youngcourt argue these points to the jury in closing, id. at 2091, even the State acknowledged some value in learning from people like Ward, id. at 2096.

23

Id. at 340.

The record supports these findings. As for the finding concerning Ward's mother's testimony, we note that the PC judge is the sole judge of the credibility of witnesses. Dillon v. State, 492 N.E.2d 661, 662 (Ind. 1986). And our review of the record reveals that Ward did not have any responsibility for or any caretaking role in anyone else's life such that his execution would cause some particular impact on another.

Moreover, although trial counsel Youngcourt testified at the PC hearing that she did not consider eliciting from Ward's mother or brother any testimony regarding the impact that Ward's execution would have on them, PCR Tr. 491, the record reveals that she did ask them their opinions as to whether Ward should spend the rest of his life in prison (as opposed to what the jury would view as the alternative – being sentenced to death), Trial II Tr. 1696, 1720. Then, during her closing argument, Youngcourt pleaded to the jury, "Don't do it. The woman who gave birth to him, who shares a birthday with him, she tells you don't do it, give him life without parole." Id. at 2092.

We do not reach a conclusion opposite the PC court that trial counsel were not deficient for failing to elicit "execution impact" testimony, in part because their eliciting Ward's family's views on whether Ward should spend the rest of his life in prison and arguing that point in closing substantially served the same end.

**II-D**

Next, Ward argues that, "[a]lthough trial counsel certainly knew that Ward's guilty plea was a mitigating circumstance under case law, they made no strategic decision not to inform the jury accordingly." Appellant's Br. 38 (citation omitted). The PC court concluded that trial counsel's strategy was reasonable and that Ward was not prejudiced.

The PC court made certain findings to support its conclusion. Specifically, it found that, "[c]onsidering the resources and time Ward insisted upon in demanding a jury trial on the penal-

24

ty and the overwhelming evidence of guilt, it is unclear how the jury would have appreciated his guilty plea on those charges as particularly mitigating." PCR App. 341. Moreover, it found that during her final argument, trial counsel advised and reminded the jury at least three times that Ward had admitted to raping and murdering Stacy Payne. This, according to the PC court, was a "strategically effective way to urge some mitigating value from Ward's guilty plea." Id. at 342.

With regard to these findings, we first note that trial counsel Youngcourt testified at the PC hearing that she had made no strategic decision not to inform the jury that Ward's guilty plea should be specifically considered as a mitigating circumstance. PCR Tr. 484. Nevertheless, she stated that she had spent a lot of time during voir dire stating that Ward had admitted to doing this. Id. And beyond that, the record supports the PC court's finding that Youngcourt, in making her closing argument, reminded the jury at least three times that Ward had admitted to rape and murder. Trial II Tr. 2083, 2086, 2092. Specifically, she repeated in closing, "We pled guilty. We pled guilty." Id. at 2086. Then, after recounting some of the mitigating evidence, she proffered to the jury, "And anything that you think of that I haven't thought of. Anything you think of that I haven't thought of." Id. at 2090. Although trial counsel might not have specifically told the jury that Ward's guilty plea was a mitigating circumstance, her closing argument substantially served that end. Put differently, we find that counsel advanced Ward's guilty plea as a mitigating circumstance even if not formally labeling it as such.

## II-E

Any deficiencies in trial counsel's performance discussed in this Part II did not prejudice Ward's defense, as the totality of the mitigating evidence produced both at trial and at the PC hearing are outweighed by the aggravating circumstances.[17] We consider first the evidence of the aggravating circumstances that the sentencing jury considered.

---

[17] This accords with the U.S. Supreme Court's methodology in assessing prejudice during habeas corpus review of state capital cases. E.g., Cullen, 131 S. Ct. at 1408-10 ("'reweigh[ing] the evidence in aggravation against the totality of available mitigating evidence'" (quoting Wiggins, 539 U.S. at 534)); id. at 1430-33 (Sotomayor, J., dissenting) (same); Bobby, 130 S. Ct. at 19-20 (same).

25

The state alleged three aggravating circumstances – that Ward tortured the victim while the victim was still alive and/or mutilated the victim while the victim was still alive, Ind. Code § 35-50-2-9(b)(11) (1998); that Ward committed the murder by intentionally killing the victim while committing or attempting to commit rape, id. § 35-50-2-9(b)(1)(F); and that Ward was on probation for a felony at the time he committed the murder, id. § 35-50-2-9(b)(9)(C). See Trial II Tr. 1200, 2128-29.

With regard to the first aggravating circumstance, the state presented testimony from Melissa Payne, Stacy's sister, who was in the house when the offenses occurred and who called for help. Both Melissa and the emergency dispatcher who took Melissa's call testified to Stacy's screaming during the attack. Id. at 1268, 1271, 1282. Melissa testified that she heard Stacy say "Please stop, please stop," to which Ward responded, "You better be quiet." Id. at 1271. Matt Keller, who was the first officer to arrive on the scene and who apprehended Ward, testified that Stacy was alive when he arrived with her arms and legs flailing about and that she was laying in a huge pool of blood, nude from the waist down, with her abdominal contents out of her body. Id. at 1299. Keller found twine in Ward's pocket that was later proven to have Stacy's blood on it. Id. at 1301-02, 1409, 1411, 1415. An EMT who responded to the scene also testified that Stacy was alive and moaning, id. at 1312; that she grimaced with pain and even cried, id. at 1313; and that she was conscious the whole time, id. at 1315. He testified that Stacy tried to fight him off and tried to crawl away, as if he were her attacker. Id. at 1310. He also described her wounds – that her midsection had been cut all the way around with the exception of about four inches; that her abdominal contents were spilling outside her body; and that her throat had also been cut from one side to the other. Id. at 1311-12.

In addition, Dr. Rodney Edwards, Jr., an emergency room physician who attempted to treat Stacy at a local hospital, elaborated on Stacy's wounds and state of consciousness. He described that "her small bowel, her small intestines were on top of her abdomen outside of the abdominal cavity . . . [,] the opening of the abdominal cavity appeared to be all the way from one

side to the other side," and that "she had a large gaping wound across the neck that did reveal the backside of the trachea" and "a gash across the left hand down to the bone." Id. at 1329. He explained that Stacy was aware of what was occurring; that there was "a little tearing in the eyes" when she was intubated; and that she squeezed a nurse's hand to show that she could understand. Id. at 1333-34. He explained that she was aware and could feel pain in the hospital and that, in fact, she was probably even more aware of what was going on before she arrived at the hospital. Id. at 1334-35. With regard to her abdominal wound, Dr. Edwards testified that it appeared to be just one continuous opening, but that at the middle of the lumbar area, there were multiple lines down to the bone that indicated "multiple attempts to get through that rigid area" and that it "looked like a carving, like an attempt to get through." Id. at 1335-36, 1341.

The forensic pathologist, Dr. Hunsaker, who performed Stacy's autopsy also testified. She reported her observation of eighteen blunt-force injuries, id. at 1472, some of which could have been caused by a dumbbell, id. at 1481-82. She explained that the wounds on Stacy's hand, pictures of which were introduced into evidence, were defense wounds, meaning that she "was trying to fend for her life." Id. at 1487, 1496-97. She testified that a particular bruise on Stacy's left shin was consistent with a ligature or binding across her leg, id. at 1489, and, similarly, that a band-like bruise on her right forearm was also consistent with a ligature, id. at 1523-24. She also described a "large gaping wound to the front of [Stacy's] neck," as illustrated by pictures introduced into evidence, and hesitation marks on the left side of Stacy's neck that suggested she was probably moving, or "trying to get away." Id. at 1497. Dr. Hunsaker explained that Stacy's windpipe near her vocal cords had been severed, as well as the right internal jugular vein; these injuries prevented Stacy from talking and inhibited her breathing. Id. at 1498-99. As for Stacy's abdominal injury, Dr. Hunsaker testified that Stacy "was almost cut in half," id. at 1496, by a wound 24.5 inches in length, id. at 1510, but that there were no "hacking marks" on Stacy's spine, id. at 1534-35. Finally, the prosecution specifically asked Dr. Hunsaker her professional opinion, "[D]o Stacy Payne's abdominal and back injuries appear consistent with someone attempting to cut her completely in two?" to which Dr. Hunsaker replied, "Yes." Id. at 1521.

Again, pictures of the injuries Stacy suffered to her abdomen and back were introduced into evidence.[18]

With regard to the second aggravating circumstance, Ward pled guilty to rape. But the State also called two DNA analysts, one who testified to one of Ward's penile swabs having Stacy's DNA on it, id. at 1417-18, and another who testified that Ward could not be excluded as a contributor to the sperm fraction on Stacy's cervical swab, id. at 1456. The forensic pathologist who performed Stacy's autopsy also described the wounds she observed in examining Stacy's vaginal area – bruising to the left aspect of the vaginal wall and a small petechial hemorrhage. Id. at 1491-92. She testified that these wounds were more likely than not inflicted by some object and that the injuries were consistent with sexual assault. Id. at 1492-93.

And as for the third aggravating circumstance, the State presented testimony from James Rice, Ward's probation officer, that Ward was on probation for a felony burglary conviction out of Missouri at the time he committed the murder. Id. at 1440-41.

**II-E-2**

Next, we consider the mitigating evidence, starting with what was presented to the sentencing jury. As mentioned above, Ward's trial counsel called a number of lay mitigation witnesses. These witnesses testified to Ward's family's history – that they had little education; often married at an early age; had a history of divorce and infidelity; had a history of mental health issues; and frequently changed residence. Id. at 1638, 1640-41, 1648-59, 1663. They testified that they thought Ward should spend the rest of his life in prison.[19] Id. at 1696, 1720. Their testimony revealed that Ward had learning disabilities; was a hyper child; missed school frequently; and was never really self-sufficient. Id. at 1669-73, 1695, 1708. At least one witness thought that Ward was favored by his parents and, in fact, was encouraged (or at least not discouraged)

---

[18] With regard to the first aggravating circumstance, this Court held in Ward's direct appeal that a reasonable jury could find torture and mutilation beyond a reasonable doubt. To be sure, we found the evidence of torture and mutilation to be overwhelming. Ward, 903 N.E.2d at 962.

[19] We considered whether Ward's trial counsel were deficient in failing to present execution-impact evidence in mitigation in Part II-C, supra.

by his father to behave poorly. Id. at 1781-83. Testimony also revealed that Ward's father had a history of exposing himself, id. at 1675, 1786-87, and it was suggested that Ward's grandfather (with whom Ward loved spending time, id. at 1677) may have had a similar history, compare id. at 1877 (Dr. Parker testifying that he had been told by the family that Ward's grandfather had a history of exposing himself), with id. at 1717 (Ward's brother testifying that he had not heard about his grandfather's exposing himself). Ward was immature and was picked on by others but nevertheless was a "likable young man." Id. at 1743-1747. Trial counsel introduced pictures of Ward as a child and with his family, id. at 1643, 1663, 1670, although Ward's mother testified that she couldn't remember certain dates of pictures because she was on medication for, among other things, depression, id. at 1663.

Moreover, two of Ward's case managers at the Indiana State Prison testified on his behalf, stating that he had only been written up once in prison and that it was for a nonviolent offense. Id. at 1724-25, 1727-28. A prison consultant also testified that Ward could be safely housed in prison for the rest of his life. Id. at 2011-12. And in her closing argument Ward's trial counsel stated several times that Ward had admitted to raping and murdering Stacy Payne, which suggested that it was something to be considered in weighing the evidence.[20] Id. at 2083, 2086, 2092.

As discussed in Part II-B, supra, trial counsel also presented three mental health professionals at the penalty phase. Dr. Edwards treated Ward for his exhibitionism in the late 1980s and early 1990s. He testified that Ward had some significant emotional problems that contributed to his exhibitionism, Trial II Tr. 1803-04; that he did not think that Ward's family was particularly supportive, id. at 1818; and that Ward did not make progress in treatment, id. at 1819-20. Dr. Edwards had suggested a more long-term sex-offender treatment for Ward because he thought that Ward's exhibitionism could become more severe.[21] Id. at 1822. Next, Dr. Parker, testified that Ward suffered from exhibitionism and antisocial personality disorder (and a special subset of that disorder called sociopathy or psychopathy). Id. at 1840. Dr. Parker explained that

---

[20] We considered whether Ward's trial counsel were deficient in failing to present his guilty plea as evidence in mitigation in Part II-D, supra.

[21] Ward's former probation officer, Meribeth Adams-Wolf, had also recommended long-term juvenile sex-offender treatment for Ward, but that never happened. Trial II Tr. 1993-97.

Ward was never really disciplined at home for his bad behavior; that, in fact, his father sold whatever Ward stole; and that Ward had learning disabilities. Id. at 1858-59, 1870. Lastly, Dr. Friedman, testified that there was something "[v]ery much wrong with [Ward]" in that he was a psychopath, id. at 1892, and that his psychopathy prevented him from conforming his conduct to the law, id. at 1920. Specifically, he explained that Ward "is not able to behave in the right or wrong way because he doesn't have the internal mechanisms that allow him to do that." Id. at 1958. According to Dr. Friedman, Ward did not volunteer to be the way that he is. Id. at 1910-15. Dr. Friedman also testified that Ward knew he was different from other people, id. at 1914, and that Ward said he regretted what he did, but Dr. Friedman explained that that is what psychopaths say, id. at 1937. Dr. Friedman described Ward as having "a manic need for activity." Id. at 1928. Finally, Dr. Friedman testified that Ward's father encouraged his antisocial behavior. Id. at 1963.

As for the evidence presented at the PC hearing, we agree with the PC court that some of it was duplicative and what was new added little in the way of mitigating value. Ward's counsel in his first trial, Barbara Williams, testified to the stressful events occurring in Ward's life at the time of the murder – that he was on probation (a fact proven by the aggravating evidence), that he was doing community service, that he was facing new charges of public indecency, and that he had been ordered to a treatment program but did not know how he could travel there. PCR Tr. 21-22. Testimony revealed that Ward had written a letter to the judge after his first trial to express his remorse. Id. at 25. As discussed supra, affidavits were introduced describing Ward's thoughtfulness and willingness to help others, and one affiant also described Ward's father's improper references to sex in front of his children. Ward's former girlfriend testified that he had treated her with "utmost respect," PCR Ex. 24, at 15, and explained that she was unhappy with the testimony she gave at Ward's second trial because she felt like she only told the negative side, id. at 22. Ward's mother testified that she argued with Ward's father in front of their children, PCR Tr. 162-65; and she felt that Ward was embarrassed by his learning disability, id. at 160, and that he felt like a "nobody" because of exhibitionism, id. at 178.[22] She also testified that she planned to commit suicide if Ward were executed. Id. at 185. Ward's brother elaborat-

---

[22] During the second trial, Ward's mother testified that Ward never talked to her about his exhibitionism and that he never told her why he exposes himself or shared any of his feelings at all. Trial II Tr. 1687.

ed on the discipline imposed on them growing up and explained that his father once shot him (Ward's brother) with a BB-gun. Id. at 193. He also testified that Ward's execution "would tear [him] apart." Id. at 196. PC counsel introduced Ward's grandfather's military-discharge papers into evidence which suggested that he too suffered from exhibitionism. Ward's PC counsel also introduced the deposition of Judge Jerome Jacobi, who explained that, during the time he represented Ward in the early 1990s, Ward appeared to be remorseful for his acts of public indecency and that Ward was committing these acts as if he wanted to be caught. PCR Ex. 23, at 14, 16. Judge Jacobi explained that Ward's "problem seemed to be his ability to control his conduct to the requirements of law." Id. at 22.

Ward's PC counsel also presented two mental health experts (Dr. Fabian and Dr. Ferraro), as discussed in Part II-B, supra. Dr. Fabian testified that Ward was a complex, complicated individual with many psychiatric diagnoses. PCR Tr. 221. He discussed Ward's lax discipline, id. at 224, and his father's condoning Ward's antisocial behavior, id. at 225. He explained that Ward probably had some alcohol dependence problems in the past. Id. at 230. According to Dr. Fabian, Ward started flashing people because he was at a loss interpersonally due to his ADHD, learning disabilities, and lack of attractiveness, id. at 235-36; and he also explained that Ward would expose himself to others to relieve stress, id. at 232. Dr. Fabian testified to the following mitigating factors: learning disability; ADHD; chronic mild depression; exhibitionism; history of familial mental illness; poor coping skills; self-esteem issues; and extreme mental emotional disturbances (including exhibitionism, depression, ADHD, learning disability, and personality disorder). Id. at 251-56. In his opinion Ward could be treated. Id. at 253. The second expert, Dr. Ferraro, also recognized certain developmental issues, like Ward's being hyper; having difficulty processing information; lacking boundaries at home and lax discipline; changing residences frequently; and his father encouraging poor behavior. Id. at 326-29. Dr. Ferraro diagnosed Ward with anxiety disorder, exhibitionism, learning disability, and antisocial personality disorder. Id. at 353-54. Dr. Ferraro explained that antisocial personality disorders are very resistant to treatment and that the best chance to treat Ward would have been when he was young. Id. at 355. And he explained that Ward's symptoms of mental illness were worsened by the stress he faced in the weeks leading up to the murder. Id. at 355-56. Finally, when asked why in his opinion Ward attempted literally to cut Stacy Payne in two during the murder, Dr. Ferraro replied that

Ward "was out of control and functioning in the midst of extreme rage . . . [triggered by a] life-time of suppressed rage." Id. at 378.

**II-E-3**

We sum up and weigh all the evidence as follows. On the mitigation side, we weigh the following evidence in the low-to-medium range: Ward had some issues in his upbringing and his family had some mental health problems, but he did not have a particularly nightmarish childhood like that in Williams or Sears; and he had some personality disorder (and, according to two mental health experts, the most severe type of antisocial personality disorder – psychopathy – through no fault of his own). We weigh the following evidence in the low range: There may have been missed opportunities to help Ward, and his family was not particularly supportive of positive behavior. His family testified that Ward should spend the rest of his life in prison and that his execution would impact them. There was also testimony presented that Ward could safe-ly be housed in prison and may be treatable. Ward admitted to raping and murdering Stacy Payne and may have felt some remorse for it. Ward did some thoughtful things and had helped others in the past. Ward had ADHD and learning disabilities; he had a history of exhibitionism and some history of alcohol dependence; he had anxiety and depression; and he had poor coping skills and was facing certain stress factors around the time of the murder. All or some of these kept Ward from conforming his conduct to the law.

On the other side of the scale are the aggravating circumstances. We weigh in the low range the aggravating circumstance that Ward was on probation for felony burglary out of Missouri at the time he committed the murder. We weigh in the high range the aggravating circum-stance that Ward committed the murder by intentionally killing Stacy Payne while committing or attempting to commit rape. We weigh in the highest range the aggravating circumstance that Ward tortured and mutilated Stacy Payne while she was alive. He tied her up. He hit her repeat-edly, causing eighteen blunt force injuries to her body. He cut her hand to the bone. He cut her throat such that her windpipe and internal jugular vein were severed, preventing her from speak-ing and inhibiting her breathing. He nearly cut her body in half such that her intestines literally spilled out of her abdomen. She remained alive while he did this, attempting to fight him off:

She was alive during the EMT care at her house and during her transport to and care at the local hospital, where she was treated for 46 minutes and finally given a sedative, Trial II Tr. 1334, 1338-39. And she was pronounced dead after being air-lifted to the University of Louisville Hospital, roughly four hours after she was first attacked by Ward. See id. at 1285, 1350-51.

After weighing the totality of the mitigating evidence against the evidence in aggravation, we conclude that Ward was not prejudiced by any inadequacies in his trial counsel's performance discussed in this Part II. There is no reasonable probability that the additional evidence presented at the PC hearing would have changed the jury's verdict.

### III

Ward's second general claim is that his trial counsel were ineffective in failing to object to certain inadmissible evidence and improper arguments by the prosecutor. Specifically, he argues that trial counsel (a) failed to challenge the State's evidence of criminal deviate conduct; (b) failed to challenge the State's use of victim-impact evidence; and (c) failed to challenge the State's testimony regarding a putt-putt golf course at the Indiana State Prison. According to Ward, "[i]f defense counsel had challenged these matters, there is a reasonable probability that the result of the penalty phase would have been different." Appellant's Br. 8. We consider each of these arguments in turn.

### III-A

Ward argues that "[t]rial counsel's failure to object to the argument and evidence of criminal deviate conduct was deficient performance that prejudiced [him] by introducing evidence of a statutory aggravating circumstance dismissed by the plea agreement." Id. at 42 (citation omitted). The PC court concluded that Ward failed to establish deficient performance or prejudice with respect to this claim.

The PC court made findings of fact from which it reached its conclusion. It recognized that, when Ward pled guilty to rape and murder, the criminal deviate conduct charge and at-

tendant aggravating circumstance originally charged were dismissed. It quoted the prosecutor's opening statement discussing the DNA obtained from an anal swab of Stacy Payne and a DNA analyst's testimony regarding the same. But the PC court found "no evidence in this record of objectionable references to criminal [deviate] conduct before the jury." PCR App. 334. It continued:

> The evidence complained of by Ward was to the presence of DNA on anal swabs. No evidence of anal penetration was introduced or argued. The presence of DNA on the victim's body was relevant to the rape aggravator. Given the position of Stacy's body it is reasonable to infer that the DNA on the anal swabs got there when it ran down her body because of gravity. No one argued [Stacy] had been anally violated or penetrated.

Id. The PC court further found that the jury's well-supported finding of three statutory aggravating circumstances was not affected by these references to DNA evidence that might support the dismissed charge of criminal deviate conduct. Rather, "the jury was not charged with considering whether Ward had committed criminal [deviate] conduct, as an aggravating circumstance, nor was it argued to them." Id.

The record supports the PC court's findings. To be sure, the record reveals some testimony regarding the presence of Ward's DNA on Stacy's anal swab, Trial II Tr. 1456, and the prosecutor's opening argument to that effect, id. at 1221. And for her part, trial counsel Youngcourt testified at the PC hearing that if she did not object to the testimony regarding Ward's DNA on the anal swab, then she must have missed it. PCR Tr. 491.

But like the PC court, our review reveals no evidence or argument regarding anal penetration and no reference to criminal deviate conduct. To the contrary, we observe that Ward's trial counsel elicited testimony refuting that very idea. Specifically, a nurse who performed a sexual assault kit on Stacy testified that there was no documentation of any blunt-force injury to her rectum or anus, Trial II Tr. 1365, and similarly, the forensic pathologist, Dr. Hunsaker, who performed Stacy's autopsy, testified that there were no injuries to the interior or exterior of Stacy's anus, id. at 1530. More importantly, our review of the record also reveals that trial counsel Youngcourt argued the exact finding that the PC court made regarding the effect of gravity. In

34

questioning Dr. Hunsaker about the fact that anal swabs were taken, Youngcourt asked: "And based on your experience and training, wouldn't it be fair to say that if a woman were raped and there was semen or sperm in the vaginal area, that it may drip down to the buttocks or the anal area?" Id. Dr. Hunsaker confirmed this to be the case. Id.

Moreover, as outlined in Part II-E, supra, the record supports the PC court's finding that the aggravating circumstances that the jury did find were well supported, and there is no indication in the record that the jury was affected by any reference to this DNA evidence that might support a criminal-deviate-conduct charge. The jury was instructed on only three aggravating circumstances at both the beginning, Trial II Tr. 1200, and end of the penalty phase, id. at 2053-54, and the record supports the PC court's finding that the jury was presented argument regarding only those three. Thus, we do not reach a conclusion opposite the PC court that trial counsel did not perform deficiently by failing to object to this testimony and, even if they did, that Ward's defense was not prejudiced.

### III-B

Next, Ward argues that trial counsel were ineffective in failing to object to certain victim-impact evidence. The PC court concluded that Ward failed to establish deficient performance or prejudice in this regard.

The PC court made findings of fact to support its conclusion. It summarized the testimony offered by Stacy's parents and sister at trial and identified the photos of Stacy and of her family introduced at that time. PCR App. 327-28. Stacy's mother detailed the family's activities in the evening preceding the murder. Stacy's sister testified that she was in college now but that she was in the eighth grade at the time of the murder. Stacy's sister also testified that Stacy was a cheerleader, a member of the band, and a member of student council. In addition, the PC court quoted the State's closing argument that praised Stacy's sister for her courage and that argued, among other things, that Stacy's life would be diminished if Ward were to receive life without parole and that asked the jury, "How can Stacy's life be somehow less valuable than [Ward's]?" Id. at 328.

35

But the PC court found no unconstitutional victim-impact evidence, and found that, even if there were, Ward's defense was not prejudiced by it. First, it found that the jury instructions explicitly directed the jury's attention to the evidence properly admitted and limited to the aggravating circumstances charged. Id. at 329. Second, its "own review of the trial record reveal[ed] no instances of the State's arguing that Ward deserved the death penalty because the suffering it caused Stacy's family." Id. at 330. Rather, the State's final argument as a whole "asked the jury to weigh the aggravating circumstances versus Ward's mitigating circumstances and interpret the evidence that either established the aggravator or diminished Ward's mitigation." Id. According to the PC court, some of the challenged comments were not objectionable because they were relevant to the facts of the crime, and some comments were properly not objected to as part of a wise trial strategy:

> These comments are not infrequently made during advocacy. Experienced trial counsel on both sides rarely object to them. Most experienced trial counsel feel this is wise trial strategy. Virtually every final argument the Court has heard contains some hyperbole and overstatement. Not objecting in these circumstances is a legitimate trial strategy practiced by lawyers in Indiana Courts every day.

Id. Finally, the PC court found that these comments did not place Ward in grave peril, and that there was no reasonable probability that had these comments been admonished, the jury's recommendation would have been different. Id. at 330-31.

Our review of the record supports the PC court's findings. First, we note that Ward has not presented any evidence that would defeat the presumption that it was part of a wise trial strategy not to object to the challenged comments or evidence. See Pruitt, 903 N.E.2d at 906 (we presume that counsel made all significant decisions in the exercise of reasonable professional judgment). Moreover, our review of the record reveals no instances of the State arguing that Ward deserved the death penalty because of the suffering it caused Stacy's family or, for that matter, because of any impact it had on her family. Rather, we agree that, as a whole, the State discussed the jury's role in weighing the aggravating and mitigating evidence during its closing argument. Trial II Tr. 2070, 2094, 2095, 2108-09. And even assuming that counsel should have objected, we agree that Ward's defense was not prejudiced by it. As we outlined above, the jury

36

was instructed on three aggravating circumstances, and the evidence supporting those was over-whelming. See Wrinkles v. State, 749 N.E.2d 1179, 1196 (Ind. 2001) (assuming counsel should have objected to victim impact statement, they were not ineffective in part because evidence supporting aggravator was strong). We do not reach a conclusion opposite the PC court that Ward's trial counsel were not ineffective for failing to object to the challenged comments or statements.

### III-C

Lastly, Ward claims that trial counsel were ineffective for failing to object to testimony regarding the existence of a putt-putt golf course at the Indiana State Prison ("ISP"). The thrust of the claim here is that counsel allowed the prosecutor to suggest that Ward was enjoying life in prison playing putt-putt when in fact there was no putt-putt course at the prison at all.

The PC court rejected this claim, and it made certain findings to support this rejection. It recounted the challenged testimony that the ISP has a putt-putt golf area and the prosecutor's arguments in closing that emphasized this point. The PC court recognized that by September, 2006, the putt-putt course was no longer operational and that Ward's second trial was held in May, 2007. PCR App. 335. The PC court found, however, that

> [t]o the extent that there was not a working miniature golf course on the grounds of the [ISP] at the time of Ward's trial, Ward was not prejudiced by the State's suggestion that [inmates] could participate in activities such as miniature golf. Petitioner's own evidence at post-conviction establishes that ISP had at least fair-ly recently had [sic] such a facility available for use by inmates. The evidence al-so established that life without parole inmates had access to a number of social, educational, and recreational activities. Regardless, the Court finds that had Ward's counsel made an effort to disabuse the jury regarding the availability of miniature golf to inmates, such would not have created any probability, let alone a reasonable one, of a different outcome.

Id. at 335-36 (internal citation omitted). We agree.

**IV**

Third, Ward claims that his appellate counsel rendered ineffective assistance. Specifically, he argues that appellate counsel failed to argue that presentation of criminal-deviate-conduct argument and evidence was fundamental error; failed to argue that presentation of victim-impact argument and evidence was fundamental error; failed to argue that Ward's guilty plea was a mitigating circumstance; and failed to challenge adequately Ward's sentence of death.[23]

The standard for gauging appellate counsel's performance is the same as that for trial counsel. Pruitt, 903 N.E.2d at 927-28.[24] Therefore, "'[t]o prevail on an ineffective assistance of counsel claim, [the petitioner] must show both deficient performance and resulting prejudice.'" Id. at 928 (alterations in original) (quoting Allen, 749 N.E.2d at 1166); see also Strickland, 466 U.S. at 687 (two-part test for ineffective-assistance-of-counsel claims). As for the first prong – counsel's performance – we presume that counsel provided adequate representation. Pruitt, 903 N.E.2d at 928. Accordingly, "'[c]ounsel is afforded considerable discretion in choosing strategy and tactics, and we will accord that decision deference.'" Id. (alteration in original) (quoting Allen, 749 N.E.2d at 1166). The second prong – the prejudicial effect of counsel's conduct – requires a showing that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. (internal quotation marks omitted) (citations omitted).

---

[23] This Court has noted that "'appellate ineffective assistance of counsel claims generally fall into three basic categories: (1) denying access to appeal; (2) waiver of issues; (3) failure to present issues well.'" Pruitt, 903 N.E.2d at 927 n.36 (quoting Allen, 749 N.E.2d at 1167 n.9). Ward's claims fall under the second and third categories.

[24] Despite these overlapping standards, this Court has noted some unique characteristics in our analysis of claims of ineffective assistance of appellate counsel:

> Appellate counsel's performance, as to the selection and presentation of issues, will . . . be presumed adequate unless found unquestionably unreasonable considering the information available in the trial record or otherwise known to appellate counsel. To prevail on a claim of ineffective assistance of appellate counsel, a defendant must therefore show from the information available in the trial record or otherwise known to appellate counsel that appellate counsel failed to present a significant and obvious issue and that this failure cannot be explained by any reasonable strategy.

Pruitt, 903 N.E.2d at 928 n.37 (ellipsis in original) (quoting Allen, 749 N.E.2d at 1166 n.8).

Applying these legal standards, the PC court concluded that appellate counsel "rendered competent, constitutionally adequate representation." PCR App. 345. Specifically, it rejected the first three of Ward's claims regarding criminal deviate conduct, victim-impact evidence, and his guilty plea as mitigating evidence by referencing its discussion of these claims as they applied to the effectiveness of trial counsel and concluding that these claims of appellate ineffectiveness of counsel failed for the same reasons. Id. at 346-47. As discussed earlier in this opinion, we affirmed the PC court's finding of no ineffective assistance of trial counsel on Ward's claims regarding criminal deviate conduct, victim-impact evidence, and the guilty plea as mitigating evidence, and for essentially the same reasons, we affirm its finding of no ineffective assistance of appellate counsel in these regards. See Pruitt, 903 N.E.2d at 930 (rejecting appellate counsel ineffectiveness claim based on prior finding of no trial counsel ineffectiveness on same issue).

With regard to Ward's fourth claim in this section – that his appellate counsel were ineffective for failing to challenge adequately his death sentence – the PC court found that this was "a 'catchall' that offers no meaningful allegation of deficient performance or prejudice with respect to appellate counsel's representation." PCR App. 347. We agree. "A convicted defendant making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." Strickland, 466 U.S. at 690. In this claim, Ward alleges that his appellate counsel were ineffective, in general, by inadequately challenging his death sentence, but he identifies no specific act or omission. The PC court properly rejected this claim.

## V

Fourth, Ward raises a claim under United States v. Cronic, 466 U.S. 648 (1984), that the trial court's rulings on certain matters prevented trial counsel from rendering effective assistance. Specifically, Ward argues that the set of facts surrounding the trial court's (a) denial of a continuance; (b) denial of funds for essential experts; and (c) decision to alter the method of jury selection justify a presumption of ineffectiveness.

In Cronic, the Supreme Court recognized that in certain limited circumstances of extreme magnitude, prejudice to a criminal defendant is so likely that an inquiry into counsel's actual performance is not required. Id. at 658-62. Stated differently, a presumption of ineffectiveness arises in certain extreme circumstances without resort to the traditional two-prong Strickland analysis. Id.; see also Florida v. Nixon, 543 U.S. 175, 190 (2004) (explaining that Cronic is a narrow exception to Strickland). The Court in Cronic identified three circumstances justifying such a presumption: (1) the complete denial of counsel; (2) situations where counsel entirely fails to subject the prosecution's case to meaningful adversarial testing; and (3) situations where surrounding circumstances are such that, "although counsel is available to assist the accused during trial, the likelihood that any lawyer, even a fully competent one, could provide effective assistance is so small that a presumption of prejudice is appropriate without inquiry into the actual conduct of the trial." 466 U.S. at 659-60.

In Cronic, the district court had appointed a young lawyer with a real estate practice who had never conducted a jury trial to represent a defendant who had been indicted for mail fraud. Although it had taken the government four-and-one-half years to investigate the case and review thousands of documents, this young lawyer had only 25 days for pretrial preparation. Id. at 649. The Tenth Circuit had held that these circumstances, among others, justified a presumption of ineffectiveness without inquiry into performance or prejudice. Id. at 652-53. The Supreme Court disagreed. While recognizing that certain extreme circumstances justify such a presumption, the Supreme Court held that the circumstances at issue in that case did not make it unlikely that the defendant could have received effective assistance of counsel. Id. at 666.

Thus, Ward faces an extremely heavy burden in making his Cronic claims. Games v. State, 684 N.E.2d 466, 481, modified on reh'g on other grounds, 690 N.E.2d 211 (Ind. 1997). In examining these claims, we look for circumstances that "justif[y] a presumption that no lawyer could provide [Ward] with the effective assistance of counsel required by the Constitution." Cronic, 466 U.S. at 665 (footnote omitted). In other words, for us to presume prejudice under Cronic, "it must be shown that the circumstances completely deprived [Ward] of any meaningful opportunity to subject the State's evidence to adversarial testing." Games, 684 N.E.2d at 479.

40

## V-A

Ward first argues that trial counsel were rendered ineffective by the trial court's denial of a necessary continuance. He argues that the trial court was aware that the mitigation investigator had not performed certain duties and was struggling in certain ways, but "nevertheless refused to provide trial counsel more time to complete the investigation necessary for the presentation of complete and accurate evidence supporting a sentence less than death." Appellant's Br. 9. The PC court rejected this claim.

The PC court made certain findings to support its conclusion. First, it found that Ward had more than eighteen months to prepare for his second trial after this Court reversed his conviction the first time, and that he did not need more time to prepare given his access to "the entire transcript of the first trial, a virtual road map of all the State's evidence and the extensive social, psychological, educational and criminal background information it contained concerning Ward's background." PCR App. 349. The PC court also listed the resources that his trial counsel had marshaled in his defense, including: Joanie Kern, Michelle Rushton, Charles Marks, Youngcourt, Ripstra, a retired Sheriff's Deputy, a professor, and two mental health experts. Id. Moreover, the PC court found that Ward "presented no mitigating evidence in these proceedings that was materially different in quantity or character from that his trial attorneys presented on his behalf," id., and therefore, even if the trial court had granted this continuance, "trial counsel could presumably have done no better than his post-conviction lawyers over three years later," id. at 349-50.

As we discussed, supra, the record supports the PC court's finding that Ward has failed to show a reasonable probability of a different outcome based on any inadequacies in the mitigation investigation. But we are not concerned here with actual prejudice; rather, we are concerned with whether the circumstances justify a presumption of prejudice. Nevertheless, we do not reach a conclusion opposite the PC court that this claim under Cronic fails.

This Court reversed Ward's conviction and sentence on June 30, 2004, following his first trial. Ward, 810 N.E.2d 1042 (Youngcourt and Ripstra served as appellate counsel on Ward's first appeal). In October, 2005, the trial court appointed Ripstra and Youngcourt to represent Ward in his retrial. Trial II App. 307. Ward's trial counsel retained their mitigation investigator in November, 2005. PCR Tr. 295. In January, 2006, the trial court set Ward's second trial date for October 16, 2006. Trial II App. 307. That October trial date was then continued pursuant to an August, 2006, motion filed by Ward's trial counsel. Id. at 307-11; Trial II Tr. 110 (granting motion for continuance after hearing). In January, 2007, after the original trial judge recused himself, Judge Pigman set the trial date for early May, 2007, Trial II Tr. 125, roughly eighteen months after Ripstra and Youngcourt had been appointed as counsel.

Moreover, the record supports that Ward's trial counsel had access to everything prepared in Ward's first trial. Barbara Williams, Ward's trial counsel from his first trial, confirmed at the PC hearing that she had made sure that all of her files and all of her knowledge regarding Ward's case were available to Youngcourt and Ripstra. PCR Tr. 26. And trial counsel Ripstra testified at the PC hearing that he had double checked with Williams that they had gotten everything from the first trial. Id. at 50. The record also supports that, in addition to Youngcourt, Ripstra, Dr. Friedman, and Dr. Parker, all of the people that the PC court identified were involved in Ward's defense: Joanie Kern, Youngcourt's assistant who handled much of the record collection, id. at 401; Michelle Rushton, the mitigation investigator, id. at 401-04; Charles Marks, an investigator who worked on getting the case moved out of Spencer County, id. at 404; Carold Baker, a retired Marion County Sheriff's Deputy who served subpoenas and assisted in finding various people, id. at 405; and Marla Sandys, a professor in the IU-Bloomington Criminal Justice Department who assisted in developing the jury questionnaires and mitigation theory, id. at 405-06.

In this case, Ward's trial counsel filed motions to continue the May, 2007, trial date on January 25, 2007, Trial II App. 396-97, and again on February 28, 2007, id. at 510-15. Trial counsel provided additional support to continue the jury trial on March 12, 2007. Id. at 644; PCR Tr. 441. The gist of these motions was that trial counsel had some other professional obligations and still had more to do in their mitigation investigation, including their mitigation inves-

42

tigator completing a social history. But as their motions indicate, they were able to handle their workloads, Trial II App. 396-97; they had interviewed some people and had collected some records and were in the process of interviewing and collecting more, id. at 511-513; and they would have a complete social history by the first week of April, 2007, id. at 647.

The circumstances surrounding the trial court's refusal to continue Ward's second trial fall far far short of justifying a presumption that no lawyer could provide Ward with the effective assistance of counsel required by the Constitution or of showing that he was completely deprived of a meaningful opportunity to subject the State's case to adversarial testing. See Cronic, 466 U.S. at 661 (not every refusal to continue a trial gives rise to a presumption of prejudice). As discussed above, Ward's counsel had roughly eighteen months in total to prepare for trial, and they had at least four months to prepare from the time Judge Pigman set the May, 2007, trial date. They had access to a variety of resources, including knowledge of everything presented in Ward's first trial, and had obtained or were in the process of obtaining various sources of mitigating evidence. We do not reach a conclusion opposite the PC court that Ward's trial counsel were not rendered ineffective by the trial court's refusal to grant a continuance.

## V-B

Next, Ward contends that trial counsel were rendered ineffective by the trial court's denial of funds for essential expert assistance, specifically experts in special education and sex-offender treatment. The PC court rejected this claim, finding that "Ward's trial attorneys were able to, and did, retain substantial and competent expert assistance," and that Ward had presented nothing on post-conviction that, if presented to the jury, would have created a reasonable probability of a different outcome at trial. PCR App. 350.

Again, as we discussed, supra, the record supports the PC court's finding that Ward has failed to show a reasonable probability of a different outcome had the jury been presented with the expert testimony presented at the PC hearing. However, we are not concerned here with actual prejudice but with whether the circumstances justify a presumption of prejudice. Nevertheless, we do not reach a conclusion opposite the PC court that this claim under Cronic fails.

Although trial counsel were not granted funds to retain an expert in sex-offender treat-ment or in special education, they were granted funds to retain two mental health experts, Dr. Friedman and Dr. Parker. They also had at their disposal all of the expert testimony presented in the first trial for both the State and the defense, including one expert who specialized in sexology or sexual dysfunction. Trial I Tr. 2407-09. And they were in the process of contacting a mental health professional who had actually treated Ward for his exhibitionism. See Trial II App. 513 (referring to Life Springs health care provider who had treated Ward for a year). Finally, trial counsel also had access to or were in the process of obtaining Ward's school records, which clearly indicated that Ward had a learning disability, and had interviewed or were in the process of interviewing people who could testify to Ward's formative years, including his education.

We do not reach a conclusion opposite the PC court that Ward's trial counsel were not rendered ineffective by the trial court's refusal to grant funds to obtain certain expert assistance (considered individually and together with his argument regarding the continuance).

## V-C

Lastly, Ward argues that "the trial court's sudden change from individual to group voir dire did not permit Ward's counsel the forum needed to reveal potential jurors' biases about the sentence someone charged with a crime like this should receive." Appellant's Br. 9.

The PC court rejected this claim, concluding that although it had been slightly reframed, it had been raised and rejected on direct appeal and was therefore barred by res judicata.[25] PCR App. 350. We agree. We rejected Ward's argument on direct appeal that the trial court commit-

---

[25] Alternatively, the PC court concluded that this claim under Cronic (along with the other two discussed supra) could have in fact been raised on direct appeal, thereby barring them from post-conviction review. PCR App. 350-51. Although we have affirmed the PC court's Cronic conclusions for other reasons, we do note that these claims would not be barred on the basis that they could have been presented on direct appeal. Cronic claims are ineffective-assistance-of-counsel claims. See Hardy v. State, 786 N.E.2d 783, 787 (Ind. Ct. App. 2003) ("Strickland and Cronic are two species of a common genus – ineffective assis-tance of counsel."), trans. denied. Ineffective-assistance-of-counsel claims may be presented for the first time in post-conviction proceedings. Jewell v. State, 887 N.E.2d 939, 941 (Ind. 2008). Thus, Ward's Cronic claims were not barred on grounds that they could have been brought on direct appeal.

ted reversible error by modifying the format of voir dire from individual to group questioning of prospective jurors. Ward, 903 N.E.2d at 955-56. Thus, while framed in a slightly different manner here, we have already decided this issue and therefore, it is barred by res judicata. See Pruitt, 903 N.E.2d at 905 (issues litigated adversely to the defendant on direct appeal are res judicata).

## VI

Fifth, Ward claims that "[t]he death penalty in Indiana, as applied, fails to comport with the United States and Indiana constitutions," Appellant's Br. 9, and that he has new evidence to prove it. Specifically, he argues that the death penalty has been arbitrarily and capriciously applied since life without parole ("LWOP") became an option for sentencing, and moreover, that Indiana's appellate review of death sentences fails to ensure that the death penalty is not being arbitrarily imposed.

## VI-A

Ward contends that the Indiana capital-sentencing process violates the Eighth and Fourteenth Amendments to the U.S. Constitution and Article I, §§ 12, 16, and 23, and Article VII, § 4, of the Indiana Constitution because "Indiana's death penalty is now rarely imposed upon a few random death-eligible defendants." Appellant's Br. 54. Although Ward cites provisions of the Indiana Constitution, his argument is based solely upon federal authority; he makes no separate state claim. Accordingly, we treat his claim as being that the Indiana death penalty scheme violates the Cruel and Unusual Punishment Clause of the Eighth Amendment, as made applicable to the states through the Fourteenth Amendment. Robinson v. California, 370 U.S. 660, 665-68 (1962).

Ward presents no satisfactory explanation as to why this claim could not have been raised on direct appeal and, as a consequence, it is not available as a basis for post-conviction relief. See Pruitt, 903 N.E.2d at 905 (issues available but not raised on direct appeal are waived). Given the nature of the claim, however, we elect to address it here as, in all likelihood, were we to

45

reject it on grounds of waiver, it would be presented in exactly the same form in a future capital case.

We believe some historical perspective is helpful in analyzing this claim. In 1972, the U.S. Supreme Court issued an opinion declaring the death penalty statutes of several states to be unconstitutional. Furman v. Georgia, 408 U.S. 238 (1972) (per curiam). However, only two justices took the view that the death penalty itself violated the Constitution;[26] three others were of the view that it was only the statutes in question that violated the Constitution.[27] (The other four justices would have held the statutes to be constitutional.[28]) This left open the possibility that a state could have the death penalty if only it could write a statute that a majority of the justices would find constitutional. Although the Indiana death penalty statute in effect at the time was not part of this litigation, the Legislature rewrote our statute the next year in an effort to meet the requirements of Furman. Pub. L. No. 328-1973, § 1, 1973 Ind. Laws 1806, 1806-08 (repealed 1976).

In 1976, the U.S. Supreme Court revisited the issue and affirmed the constitutionality of two new death penalty statutes, Gregg v. Georgia, 428 U.S. 153 (1976) (plurality opinion); Proffitt v. Florida, 428 U.S. 242 (1976) (plurality opinion), but invalidated one, Woodson v. North Carolina, 428 U.S. 280 (1976) (plurality opinion). Indiana again revised its statute to conform to these decisions. Pub. L. No. 340-1977, § 122, 1977 Ind. Laws 1533, 1595-98 (codified as amended at Ind. Code § 35-50-2-9 (2008)). The new Indiana statute authorized the death penalty only for a defendant convicted of murder where the state proved the existence of one or more statutory aggravating circumstances beyond a reasonable doubt and the weight of the aggravating circumstance(s) was greater than the combined weight of any mitigating circumstances.

---

[26] Furman, 408 U.S. at 257 (Brennan, J., concurring); id. at 314 (Marshall, J., concurring).
[27] Id. at 240 (Douglas, J., concurring); id. at 306 (Stewart, J., concurring); id. at 310 (White, J., concurring).
[28] Id. at 375 (Burger, C.J., dissenting); id. at 405 (Blackmun, J., dissenting); id. at 414 (Powell, J., dissenting); id. at 465 (Rehnquist, J., dissenting).

Under the new statute adopted in Indiana in 1977, a defendant convicted of a single count of murder but <u>not</u> sentenced to death faced a maximum term of 60 years' imprisonment.[29]  Pub. L. No. 340-1977, § 116, 1977 Ind. Laws 1533, 1593 (codified as amended at Ind. Code § 35-50-2-3(a) (2008)).  In 1993 and 1994, the Legislature revised the death penalty statute to permit a sentence of either death <u>or</u> LWOP to be imposed upon a defendant convicted of murder where the weight of aggravating circumstance(s) proved beyond a reasonable doubt was greater than the combined weight of any mitigating circumstances.  Pub. L. No. 250-1993, § 2, 1993 Ind. Acts 4478, 4478 (codified as amended at Ind. Code § 35-50-2-9 (2008)); Pub. L. No. 158-1994, § 7, 1994 Ind. Acts 1849, 1854 (codified as amended at 35-50-2-9 (2008)).  We think the intent of this change is clear: the Legislature wanted there to be an intermediate penalty for aggravated murder, one less severe than death but more severe than a term of 60 years.[30]

Going back to <u>Furman</u>, one of the justices voting to hold the death penalty unconstitutional as applied in that case did so on the basis that the infrequent imposition of the death penalty made it "cruel and unusual."  In perhaps the most famous sentence of the 233-page <u>Furman</u> decision, Justice Stewart said that "death sentences are cruel and unusual in the same way that being struck by lightning is cruel and unusual."  408 U.S. at 309 (Stewart, J., concurring).  Only "a capriciously . . . random handful" of those who commit equally reprehensible crimes received death sentences; the Constitution "cannot tolerate the infliction of a sentence of death under legal systems that permit this unique penalty to be so wantonly and so freakishly imposed."  <u>Id.</u> at 309-10.

Ward seizes upon Justice Stewart's language in <u>Furman</u> to argue that, since the Indiana death penalty statute was amended in 1993 and 1994 to add LWOP as an alternative sentence to death, the imposition of the death penalty itself has become so infrequent as to now be unconsti-

---

[29] This was the maximum term of years for one count of murder.  Additional time could be imposed if the defendant was guilty of additional crimes.  <u>See, e.g.</u>, <u>Roark v. State</u>, 644 N.E.2d 565, 573 (Ind. 1994) (consecutive sentences of 50 years each for three murder convictions).  The maximum term of years for one count of murder was increased to 65 years in 1995.  Pub. L. No. 148-1995, § 4, 1995 Ind. Acts 3068, 3069 (codified as amended at Ind. Code § 35-50-2-3(a) (2008)).

[30] Accepting for hypothetical purposes that the pre-LWOP statute was constitutional but the post-LWOP statute is not, Ward's jury would have not had the option of LWOP but only death or a term of 65 years.  One might reasonably conclude that Ward was better off being sentenced under a statute that he contends is unconstitutional than the one it replaced.

tutional in the same way that it was in <u>Furman</u>. In support of this argument, a team of researchers working on Ward's behalf analyzed Indiana murder cases from 1977 to 2010 where the defendant was what Ward calls "death eligible" – 347 defendants "either charged with or threatened with a charging on information on death."[31] PCR Tr. 123. Ward's statistics show that before LWOP was authorized, 32% of those eligible for death received a death sentence. <u>Id.</u> at 128. After LWOP was authorized, 10% of death-eligible defendants have been sentenced to death. <u>Id.</u>

We hold that Ward has not established a violation of the Cruel and Unusual Punishment Clause for three separate reasons.

First, while it is true that the infrequency of the death penalty was one of the reasons articulated by Justice Stewart and other justices in the majority in <u>Furman</u>, the subsequent authorization of death sentencing schemes did not turn on the frequency of the penalty's use but on the structure of the statutes themselves. As the State points out in its brief on this subject, subsequent Supreme Court cases have "clarified that <u>Furman</u> was not necessarily concerned with the number of cases in which the death penalty was ultimately imposed, but with the <u>manner</u> in which the death penalty was imposed." Appellee's Br. 45 (emphasis in original). "<u>Furman</u> mandates that where discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action." <u>Gregg</u>, 428 U.S. at 189 (opinion of Stewart, J.). The Indiana statute meets this so-called "guided discretion" requirement with its specification of aggravating circumstances and requirement as to weighing them against any mitigating circumstances.

One aspect of the 1976 U.S. Supreme Court decisions helps illustrate this point. Following <u>Furman</u>, some states (including Indiana) did not adopt "guided discretion" statutes but instead adopted mandatory death penalty schemes. That is, death was required for all murders in a certain category (like premeditated murders or murders committed during another felony).

---

[31] We have used some shorthand here to describe Ward's methodology. For purposes of our analysis and, given our disposition of his claim, we believe this description adequate and accept his data and methodology as accurate.

These were obviously statutes responding to the concern of infrequently imposed death sentences. But the Supreme Court invalidated these approaches because they barred juries from considering mitigating circumstances. <u>Woodson</u>, 428 U.S. 280. To repeat, to meet constitutional muster, it is the manner in which the death penalty is imposed, not the frequency.

Second, Ward's analysis deploys in support of his position those cases in which a prosecutor exercised discretion not to pursue death. In calculating the percentages of death sentences imposed pre- and post-LWOP, Ward divides the number of death sentences imposed following trial (or guilty plea) by the total number of cases in which the law authorized the prosecutor to seek a death sentence. That is, included in his denominator are all those cases in which the defendant was "death eligible" by his definition but where the prosecutor elected not to seek death. Neither the data in the record nor the testimony at the PC hearing indicates how many such death-never-sought-or-dropped-before-trial cases there were – it is not even clear that any separate count was made of such cases.

But we do know that once LWOP was enacted, the prosecutor had a new option in death-eligible cases. Given this new option, it only makes sense that there would be a lot more death-never-sought-or-dropped-before-trial cases post-LWOP than pre-LWOP, thereby reducing the percentage of death sentences imposed in initially death-eligible cases.

What Ward's statistics really prove, then, is the commonsense proposition that once prosecutors had the option to seek LWOP, they sought death less frequently.

This does not make our statute unconstitutional. In fact, the U.S. Supreme Court has explicitly held that a death penalty statute need not constrain prosecutorial discretion to be constitutional. The Court held in <u>Gregg</u> that a "state prosecutor has unfettered authority to select those persons whom he wishes to prosecute for a capital offense and to plea bargain with them. . . . is not determinative of" whether a death penalty statute is constitutional. 428 U.S. at 199 (opinion of Stewart, J.). The decision to seek a death sentence, the Court continued, is one of the stages in which

49

an actor in the criminal justice system makes a decision which may remove a defendant from consideration as a candidate for the death penalty. Furman, in contrast, dealt with the decision to impose the death sentence on a specific individual who had been convicted of a capital offense. Nothing in any of our cases suggests that the decision to afford an individual defendant mercy violates the Constitution. Furman held only that, in order to minimize the risk that the death penalty would be imposed on a capriciously selected group of offenders, the decision to impose it had to be guided by standards so that the sentencing authority would focus on the particularized circumstances of the crime and the defendant.

Id. (footnote omitted).

Third, while Ward's data clearly shows a statistically significant difference between the rates at which death sentences were imposed for crimes committed pre- and post-1993, adoption of LWOP was not the only significant change in Indiana death penalty law that occurred during this time period. Effective January 1, 1990, Indiana Criminal Rule 24 created minimum standards for experience, specialized training, compensation, and caseload of lawyers appointed in capital cases. Prosecutors and defense attorneys agree that "Rule 24 ha[s] led to improved representation by defense lawyers in capital cases." Norman Lefstein, Reform of Defense Representation in Capital Cases: The Indiana Experience and Its Implications for the Nation, 29 Ind. L. Rev. 495, 509 (1996)).[32] In addition to the statutory change that made it more likely that prosecutors would exercise their discretion not to seek death, we think that the operation of Criminal Rule 24 likely also contributed to the reduction in the rate of death sentences imposed since 1993.

For the reasons discussed, we do not find the reduction in the rate of death sentences imposed since 1993 to result from any constitutional infirmity in our death penalty statute.

**VI-B**

Ward also contends that death sentences in Indiana are not subjected to meaningful appellate review, thereby rendering our death penalty process unconstitutional. Perhaps it is not possible for us to be objective in evaluating a claim directed at this Court's own performance,

---

[32] The Rule was amended on January 1, 1992, and February 1, 1993. Lefstein, supra, at 495-96 n.3.

50

but we believe that any fair reading of this Court's death penalty jurisprudence would yield the conclusion that each of our decisions comes only after the most careful study and analysis. In addition, as Criminal Rule 24 and other actions reflect, this Court gives a great deal of thought and attention to the death penalty process as well as individual cases. At the time of the PCR hearing, Ward reported that 94 individuals had been sentenced to death in Indiana since 1977. PCR Tr. 84. Of those, 22 had been executed, 12 were currently on death row, and 4 had died of other causes. We have reviewed the remaining 56 cases and found that in 44, the individuals received relief from their death sentences on direct appeal or in state post-conviction proceedings.[33] We believe this record is indicative of a death penalty system that provides the appellate review required by the Constitution.

### VII

Finally, Ward makes a claim under Napue v. Illinois, 360 U.S. 264 (1959), regarding the prosecutor's use of false testimony. Specifically, Ward argues that the prosecutor used testimony about the existence of a putt-putt golf course at the Indiana State Prison that the prosecutor knew or should have known to be false and that the testimony may have had an effect on the outcome of the trial. The PC court rejected this claim.

Initially, the PC court concluded that this claim was waived because it was available for direct appeal but not raised. PCR App. 362. It found that trial counsel Youngcourt had "testified at post-conviction that she 'knew more about the Indiana State Prison' than the prosecutor ever could" and that she had been going to the prison for 16-17 years. Id.

Nevertheless, the PC court concluded that the claim was without merit. It concluded that because "[f]undamental error is not available on post-conviction review," id. (citing Sanders v. State, 765 N.E.2d 591, 592 (Ind. 2002)), "the only procedurally available posture in which to litigate these alleged instances of prosecutorial misconduct on post-conviction review is to show that trial and/or appellate counsel were ineffective in responding to them," id. It then analyzed

---

[33] The remaining 12 cases are comprised of 9 in which relief was provided in federal habeas proceedings and 3 by gubernatorial clemency.

the claim under the traditional prosecutorial misconduct standard that considers whether the prosecutor engaged in misconduct and whether that misconduct placed Ward in grave peril and concluded that the claim failed.

Even if we were to conclude that the testimony elicited by the State concerning the putt-putt golf course constituted "false testimony" within the meaning of Napue, we agree with the PC court that the issue could have been raised on direct appeal and, consequently, is not available here. See Pruitt, 903 N.E.2d at 905 (issues available but not raised on direct appeal are waived).

## Conclusion

We affirm the PC court's denial of Ward's petition for post-conviction relief.

Dickson, C.J., and Rucker, David, and Massa, JJ., concur.