## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Nov 30 2020, 10:21 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Amy E. Karozos
Public Defender of Indiana

Meggan E. Smith
Deputy Public Defender
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Courtney Staton
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Melvin Sanders,

*Appellant-Petitioner,*

v.

State of Indiana,

*Appellee-Respondent,*

November 30, 2020

Court of Appeals Case No.
20A-PC-942

Appeal from the Allen Superior Court

The Honorable Frances Gull, Judge

Trial Court Cause No.
02D04-1404-PC-52

**Robb, Judge.**

# Case Summary and Issues

[1] In 2012, Melvin Sanders pleaded guilty to murder and was sentenced to serve sixty years in the Indiana Department of Correction ("DOC"). On direct appeal, Sanders challenged his sentence, and this court affirmed. *Sanders v. State*, No. 02A03-1206-CR-262 (Ind. Ct. App. Jan. 31, 2013). In 2014, Sanders, pro se, filed a petition for post-conviction relief, and in 2018, Sanders, by counsel, filed an amended petition. Following an evidentiary hearing, the post-conviction court denied Sanders' petition. Sanders now appeals and raises three issues, which we consolidate and restate as: (1) whether the post-conviction court erred in concluding Sanders was competent at the time he pleaded guilty; and (2) whether the post-conviction court erred in determining Sanders' trial counsel was not ineffective. Concluding the post-conviction court did not err in either respect and therefore, did not err in denying Sanders' petition, we affirm.

# Facts and Procedural History

[2] We briefly summarized the underlying facts supporting Sanders' conviction in his direct appeal:

> On September 7, 2011, Sanders got into an argument with his cousin, Eric Robinson, at an apartment complex in Fort Wayne. The two agreed to go downstairs and settle things. Sanders armed himself with a knife, which he hid in the waistband of his pants. Shortly after a fistfight began, Sanders stabbed Robinson multiple times, causing injuries that resulted in Robinson's death on September 18, 2011.

On November 3, 2011, the State charged Sanders with murder.

*Id.* at *1. Sanders was represented by Jeffrey Raff.

[3] A jury trial for Sanders and his co-defendant, Theopulus Gordon, was scheduled to begin on May 1, 2012. On the morning of trial, after addressing preliminary matters and before voir dire, Raff asked to approach the bench to discuss "a plethora of newly discovered issues[.]" [T]ranscript of the Guilty Plea Hearing at 11.[1] Raff informed the trial court that Sanders indicated "he is going to get up on the witness stand and testify that he is the one that did the stabbing" and would likely claim self-defense and state that his co-defendant was not involved. *Id.* at 12. The trial court agreed to give Raff and Sanders an additional thirty minutes to speak before proceeding.

[4] After the two conferred, court reconvened and Raff asked Sanders, on the record, whether it was his "intention to plead guilty to this murder" to which Sanders responded, "Yeah. Yes sir." *Id.* at 16-17. Raff questioned Sanders:

> Mr. Raff: Is it your desire to enter a plea of guilty or to proceed with our jury trial?
>
> [Sanders]: Yes.
>
> Mr. Raff: Which answer, which question are you answering, do you want to plead guilty? I need to hear your words.
>
> [Sanders]: Guilty. Guilty. Guilty. Guilty. Guilty. Guilty.

---

[1] Citation to the transcript of the guilty plea hearing is based on the .pdf pagination.

*Id.* at 17. The trial court then placed Sanders under oath and questioned him to determine whether his plea was being made freely and voluntarily. Sanders indicated he had not been treated for any mental illness and did not suffer from any mental or emotional disability. Notably, he indicated that he understood all the rights he would be waiving by pleading guilty; that he would be found guilty of murder and sentenced without a trial; and the penalties for such a conviction. Sanders also swore that no one was forcing or causing him to plead guilty and his guilty plea was his "own free and voluntary act[.]" *Id.* at 26. Sanders then pleaded guilty.

[5] Before establishing the factual basis for his guilty plea, Sanders stated, "I just want to apologize to Theopulus and the Gordon family and the (unintelligible word) family and the Robinson family and myself and my momma and you." *Id.* at 27. Raff then questioned Sanders to establish the factual basis:

> Mr. Raff: Were you with Mr. Robinson?
>
> [Sanders]: Yes. Yes sir.
>
> * * *
>
> Mr. Raff: And you and Mr. Robinson . . . were in fact . . . related, were you not?
>
> [Sanders]: (Nodding in the affirmative). (Unintelligible words).
>
> Mr. Raff: And there was a beef, for lack of a better word you got into a beef with him did you not?
>
> [Sanders]: This is true.
>
> * * *

Mr. Raff:     And you and he had had a relationship which would best be described by friction. I mean over the years you guys have been kind of edgy with each other, is that a fair statement?

[Sanders]:    I wouldn't say that. . . . We have our days. . . . I love 'em. As far as what happened (defendant crying) . . .

Mr. Raff:     And you probably were not using your best of judgment because for various reasons that night, correct?

[Sanders]:    Yeah. Yes.

Mr. Raff:     And there got to be a time when you and Mr. Robinson and another individual decided to go downstairs to kind of settle things and I don't know what was meant by that. Is that right?

[Sanders]:    No Theopulus Gordon didn't have anything to do with anything.

* * *

Mr. Raff:     . . . But you and Mr. Robinson went downstairs correct?

[Sanders]:    Yes sir.

* * *

Mr. Raff:     And you took a knife from the apartment with you did you not?

[Sanders]:    Yes.

Mr. Raff:     And did it get to the point that you and Mr. Robinson exchanged words?

[Sanders]:    Yes.

* * *

Mr. Raff:     And you stabbed him multiple times did you not?

| [Sanders]: | Yes sir. |
| --- | --- |
| Mr. Raff: | And did you know that your knife was in fact injuring him?  It happened very fast didn't it. |
| [Sanders]: | Yes. |
| Mr. Raff: | And you know now that the stabbing that you engaged in caused his death? |
| [Sanders]: | Yes sir. |

*Id.* at 27-30.  The State also questioned Sanders.  When asked whether it "was you and you alone that stabbed . . . Robinson[,]" Sanders responded, "Yes" and agreed he stabbed him multiple times.  *Id.* at 31.  Sanders also stated that after the stabbing, he ran, subsequently returned to the scene, and hid the knife.  At one point during the questioning, Sanders testified that he was drunk during the incident.

[6]     The trial court asked, "Mr. Sanders you weren't so drunk that you didn't know what you were doing did you?" to which Sanders responded, "I didn't." *Id.* at 33.  When asked again whether he knew what he was doing, Sanders stated, "No I didn't.  It wouldn't have happened if I did. . . . If I was sober that would never happen ever.  I'm not blaming on the alcohol, I take my full responsibility as a man today." *Id.* at 33-34.  Raff sought to clarify Sanders' responses by further questioning:

| Mr. Raff: | You knew what you were doing when you were up in the apartment and took the knife correct? |
| --- | --- |
| [Sanders]: | I didn't know that was gonna happen though. |

Mr. Raff:       No you didn't know what was eventually going to happen but you . . . intentionally got the knife from, I assume the drawer or the counter of the apartment correct?

[Sanders]:      We was eatin' pizza.

Mr. Raff:       Yeah you were eating pizza so the knife was associated with you eating the pizza right?

[Sanders]:      Yes.

Mr. Raff:       And when you got downstairs you showed off the knife didn't you?

[Sanders]:      Yes.

Mr. Raff:       I don't know who you showed it to but you, you know in fact that it's all on video that you're flashing the knife to let somebody know that you've got the knife?

[Sanders]:      Yes.

Mr. Raff:       And somewhere during the process you and Mr. Robinson you were mixing it up, you grabbed that knife[?]

[Sanders]:      It . . . altercation, throw punches.

Mr. Raff:       And you . . . he threw a punch and you threw a knife right?

[Sanders]:      No he threw a punch, I threw a punch, I couldn't take it and I stabbed him.

Mr. Raff:       You got upset? You got upset with the punches?

[Sanders]:      Correct.

Mr. Raff:       Then you grabbed the knife?

> [Sanders]: Yes.
>
> Mr. Raff: And you stabbed him?
>
> [Sanders]: I didn't want to end up like (unintelligible words).

*Id.* at 34-35. The State asked Sanders if he knew what he was doing and was sorry for what he had done. Sanders responded, "Surely and (unintelligible words) for what I did cause it not only affect me it affected my family." *Id.* at 36. The parties accepted the factual basis. The trial court then accepted Sanders' guilty plea, finding that Sanders understood the nature of the charge against him and the possible sentence; there was a factual basis for the plea; and Sanders' plea was made freely and voluntarily.

[7] A pre-sentence investigation report was prepared, which revealed that Sanders has an eleventh grade education, receives social security disability for a learning disability, suffers from attention deficit hyperactivity disorder ("ADHD") for which he takes medication, and has a criminal history comprised of two juvenile adjudications and one misdemeanor conviction as an adult. *See* [Prior Case] Appellant's Appendix [containing] Presentence Investigation Report at 5-8.[2]

---

[2] In 2007 and 2009, Sanders was adjudicated a delinquent child for acts that, if committed by an adult, would constitute burglary, Class C and B felonies. In 2008, he was adjudicated a delinquent child for what would constitute battery, a Class B misdemeanor, if committed by an adult. As an adult, in 2010, Sanders was convicted of being a minor in possession of alcohol.

[8]   A sentencing hearing was held on May 31, 2012. During the hearing, Sanders indicated he was satisfied with Raff's representation and that he reviewed the pre-sentence investigation report, and it was accurate. Raff asked the trial court to recognize Sanders' acceptance of responsibility by pleading guilty, which "prevented [his co-defendant] from . . . the risk of a conviction for murder." Sentencing Hearing Transcript, Volume 1 at 6.[3] The trial court entered judgment of conviction for murder. Finding Sanders' guilty plea and acceptance of responsibility "fairly significant" mitigating factors and the nature of the offense and Sanders' criminal history aggravating factors, the trial court sentenced Sanders to sixty years in the DOC. *Id.* at 17. Sanders appealed, arguing his sentence was inappropriate under Indiana Appellate Rule 7(B), and a panel of this court affirmed. *See Sanders*, No. 02A03-1206-CR-262 at *1-3.

[9]   On April 16, 2014, Sanders, pro se, filed his petition for post-conviction relief. On August 20, 2018, Sanders, by counsel, amended his petition and alleged: (1) he was denied substantive due process when he was allowed to plead guilty when he was incompetent; and (2) his trial counsel provided ineffective assistance of counsel by failing to request a competency evaluation and hearing prior to his guilty plea and by failing to investigate and present evidence of his mental conditions and disability as mitigating factors. *See* Appendix to Brief of Appellant, Volume II at 32-36.

---

[3] Citation to the transcript of the sentencing hearing is based on the .pdf pagination.

[10]     Sanders subsequently retained Dr. James Cates, a psychologist, to evaluate his developmental and intellectual abilities for purposes of his post-conviction relief petition. Dr. Cates reviewed Sanders' mental health and education records, including social security disability records, and interviewed Sanders and Sanders' mother.

[11]     An evidentiary hearing was held on August 2, 2019. At the hearing, Dr. Cates testified that he met with Sanders twice for a total of four hours during which he conducted an assessment to determine whether Sanders was competent to plead guilty. At the time of the evaluation, Sanders was almost twenty-six years old. Dr. Cates administered three cognitive tests: the MacArthur Competence Assessment Tool[4]; the Wechsler Adult Intelligence Scale, Fourth

---

[4] Dr. Cates provided an explanation of this tool:

> MacArthur is a standardized measure to understand competence or to assess competence. It has three separate aspects. It assesses understanding, reasoning, and appreciation. Understanding is the factual understanding of adjudication, of the jurisprudence process. Reasoning is the ability to understand alternatives and give a rationale for the reason for alternatives. And appreciation, then, is the Defendant's ability to understand and appreciate their own case and how that would move forward.

[PCR] Transcript, Volume 2 at 9.

Edition ("WAIS 4")[5]; and the Wide Range Achievement Test, 4th Edition.[6] Dr. Cates determined Sanders was not competent at the time he pleaded guilty.

[12] The MacArthur tool assesses the defendant's understanding, reasoning, and appreciation of the jurisprudence process. Dr. Cates stated that Sanders has a "very, very limited understanding of the actual process of adjudication in a criminal setting" and "he had virtually no understanding or appreciation of what was happening or why and what could realistically happen" in his post-conviction case. [PCR] Transcript, Volume 2 at 9-10. Compared to the understanding and appreciation portions, Sanders' reasoning, however, "was an area of strength, but he still lacks the ability to really be able to rationally provide an understanding or logically move through information that he would provide" to an attorney. *Id.* at 10. He explained, "in other words, [Sanders] could understand what information was relevant and needed to provide to an attorney; but [that] did not mean that he could then logically flesh it out or provide further information to an attorney to give detail or to give an understanding of how that information was useful." *Id.*

[13] With respect to the WAIS 4, Dr. Cates testified that Sanders "achieved a full-scale IQ of 55" placing him "in the extremely low range of intellectual

---

[5] This scale "is a measure of intellectual functioning [and] looks at [a defendant's] ability to function in situations in which one would anticipate that he would be able to use skills that one would use in academic settings, in any kind of setting where there's going to need to be an analysis of information and an ability to logically consider situations and respond with problem solving and decision making." *Id.* at 10-11.

[6] This test measures overall achievement in the areas of reading, written language, and math skills. *See id.* at 12.

functioning[.]" *Id.* at 11. Dr. Cates stated "in and of itself with an IQ of 55 I would not say that he is not competent to stand trial, but it would be a red flag [that] there is a strong probability that he is not competent to stand trial." *Id.* And finally, Dr. Cates testified that Sanders' Wide Range Achievement Test revealed that Sanders performed at an early third-grade level in terms of sight reading, written language, and math, and an early first-grade level for his actual reading ability. This meant that Sanders was essentially "functionally illiterate." *Id.* at 12. In terms of competency, Dr. Cates opined that the results were another "red flag" but stated "it doesn't mean that he would not be competent, but it's another piece that suggests [Sanders] is going to have significant difficulties understanding and processing what happens in a courtroom setting." *Id.*

[14] In addition, Dr. Cates' written assessment was admitted into evidence. Of the three cognitive tests performed, the MacArthur tool is the only one that specifically compares a defendant's score to a large group of defendants found to be competent.[7] Sanders' percentile scores, compared to those found competent, were 0.6 for Understanding, 14.9 for Reasoning, and 3.8 for Appreciation. *See* [PCR] Exhibit, Volume 1 at 227.

[15] The results of the three cognitive tests were consistent with the documentation Dr. Cates reviewed, as well as with an intellectual disability and his

---

[7] Dr. Cates testified there were individual studies with small samples for the other two tests.

observations of Sanders' demeanor and behavior. Notably, Dr. Cates believed that, a majority of the time, Sanders "had a fairly concrete understanding" of what and how things were happening, meaning his understanding was "[s]implistic, here and now, could not abstract ideas, could not understand things in a more complex way." [PCR] Tr., Vol. 2 at 13. Although he did not do any neuropsychological testing, Dr. Cates believed Sanders had a major neurocognitive disorder.[8] Ultimately, Dr. Cates opined that Sanders was incompetent at the time he pleaded guilty.

[16] Dr. Cates did not, however, ask Sanders about his understanding of the specific facts of the original murder case because he believed it was "not germane to the question of whether he was competent." *Id.* at 17. He also did not interview Raff or question Sanders about his ability to assist his attorney in the murder case; he lacked specific knowledge about Sanders' understanding or lack of understanding of the facts of his original murder case. Dr. Cates explained that the questions contained in the MacArthur tool assume a defendant is being asked about current litigation; he could modify the questions but would risk potentially invalidating the measure and therefore the results, so he chose not to.

---

[8] Dr. Cates interviewed Sanders' mother and learned Sanders had prenatal syphilis for which he was treated after birth. Sanders also consumed plaster paint chips containing lead as a child, which possibly caused his learning disability.

[17]     Raff also testified at the hearing. He explained that when an individual is assigned a public defender, the investigator for the public defender's office conducts an initial interview and compiles notes into a memo, which are included in the client's file. The memo was admitted into evidence and indicated that Sanders had ADHD and an eleventh-grade education; he understood the probable cause affidavit; and he refused to discuss the case with the investigator. *See* [PCR] Exhibits, Vol. 1 at 230. The police reports attached to the memo indicated Sanders told responding law enforcement officers he was unable to read or write, he had been a special education student, and he did not understand his rights. Raff testified that, prior to Sanders' guilty plea, the information contained in the memo was all he knew about Sanders' mental health. *See* [PCR] Tr., Vol. 2 at 25. Raff did not request any records regarding Sanders' intellectual function, education, or mental health. When asked why he did not request any mental health records, Raff stated:

> I was satisfied, from my conversations with Mr. Sanders, that he understood what was going on, whether – my conversations seemed to be productive with him. I didn't feel that I needed, prior to trial, to do a background check. As long as he could communicate with me, understood what we were talking about, I was satisfied. This was not a situation where I felt that he . . . didn't understand the proceedings. [I]f I had gotten th[at] sense[,] I would have proceeded to have him examined, but I didn't have anything before me that indicated that he did not understand what was going on or what we were talking about.

*Id.* at 29. Raff stated he "had no reason to have [Sanders] evaluated" by a mental health professional. *Id.* at 33.

[18]     Raff testified that prior to Sanders' sentencing hearing, he reviewed the pre-sentence investigation report. He did not request additional documentation. And when asked about mitigating factors in the case, Raff believed the primary mitigating factor was Sanders' acceptance of responsibility and the fact that his co-defendant avoided a conviction for what Sanders admitted to.

[19]     On March 26, 2020, the post-conviction court issued an order denying Sanders' petition and concluding, in pertinent part:

> Evidence tending to establish that [Sanders] was competent when he entered his guilty plea includes his extensive statements at the guilty plea hearing expressing understanding of his rights, the charge, the proceeding, and the facts; Attorney Raff's recollection that [Sanders] was able to communicate with him and understood the charges and the nature of the proceedings; and [Sanders'] ability to "recognize relevance and evaluate alternatives" as observed by Dr. Cates. Evidence tending to establish that [Sanders] was not competent includes his low general level of intellectual abilities and functioning, not shown to have any ascertainable relation to the concrete and specific abilities needed for competency; his poor performance on the Understanding and Appreciation portions of the MacArthur [tool]; and Dr. Cates's conclusion that [Sanders] was not competent to plead guilty, founded upon his limited general abilities and largely poor test performance rather than upon any specific determination of whether [Sanders] understood the facts, charges, and proceedings in his murder case and was able to communicate about those matters with attorney Raff. [Sanders] has fallen far short of proving by a preponderance of the evidence that he was not competent to plead guilty.

Appealed Order at 20-21, ¶ 7. The post-conviction court also concluded that Sanders' counsel was not ineffective for failing to seek a competency evaluation and hearing or by failing to present evidence of a mental health condition as a mitigating factor. Sanders now appeals. Additional facts will be provided as necessary.

# Discussion and Decision

## I. Post-Conviction Standard of Review

[20] Sanders appeals the denial of his petition for post-conviction relief. Post-conviction proceedings are civil in nature and the petitioner must therefore establish his claims by a preponderance of the evidence. Ind. Post-Conviction Rule 1(5). "Post-conviction proceedings do not afford the petitioner an opportunity for a super appeal, but rather, provide the opportunity to raise issues that were unknown or unavailable at the time of the original trial or the direct appeal." *Turner v. State*, 974 N.E.2d 575, 581 (Ind. Ct. App. 2012), *trans. denied*. On appeal, a petitioner who has been denied post-conviction relief faces a "rigorous standard of review." *Dewitt v. State*, 755 N.E.2d 167, 169 (Ind. 2001). To prevail, the petitioner must show that the evidence as a whole leads unerringly and unmistakably to a conclusion opposite that reached by the post-conviction court. *Hall v. State*, 849 N.E.2d 466, 469 (Ind. 2006). When reviewing the post-conviction court's order denying relief, we will "not defer to the post-conviction court's legal conclusions," and the "findings and judgment will be reversed only upon a showing of clear error—that which leaves us with a

definite and firm conviction that a mistake has been made." *Humphrey v. State*, 73 N.E.3d 677, 682 (Ind. 2017) (quoting *Ben-Yisrayl v. State*, 729 N.E.2d 102, 106 (Ind. 2000), *cert. denied*, 534 U.S. 830 (2001)). The post-conviction court is the sole judge of the weight of the evidence and the credibility of witnesses. *Fisher v. State*, 810 N.E.2d 674, 679 (Ind. 2004).

## II. Competence to Plead Guilty

Sanders first argues his "guilty plea was not knowing, intelligent, and voluntary because he was incompetent at the time of his plea[.]" Brief of Appellant at 19. We disagree.

A guilty plea constitutes a waiver of constitutional rights; therefore, the defendant's decision to plead guilty must be knowing, voluntary, and intelligent. *Barber v. State*, 141 N.E.3d 35, 44 (Ind. Ct. App. 2020), *trans. denied*. A defendant cannot voluntarily and intelligently waive his constitutional rights if he is not sufficiently competent to do so. *Suldon v. State*, 580 N.E.2d 718, 720 (Ind. Ct. App. 1991), *trans. denied*. The standard for competency to plead guilty is the same standard as competency to stand trial, namely "whether the defendant has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding and has a rational as well as factual understanding of the proceedings against him." *Godinez v. Moran*, 509 U.S. 389, 396, 399 (1993) (internal quotations omitted). Accordingly, a defendant is not competent to stand trial when he is unable to understand the proceeding and

assist in the preparation of his defense. Ind. Code § 35-36-3-1(a); *Barber*, 141 N.E.3d at 42.

[23] In this case, the post-conviction court concluded that evidence tending to establish Sanders' competence at the time he pleaded guilty included his "extensive statements at the guilty plea hearing expressing his understanding of his rights, the charge, the proceeding, and the facts[,]" Raff's testimony, and Dr. Cates' testimony that Sanders' recognized relevance and could evaluate alternatives. Appealed Order at 20-21, ¶ 7.

[24] First, at the guilty plea hearing, Sanders affirmed under oath that he had not been treated for mental illness, did not suffer from a mental or emotional disability, and that he understood his rights and the penalties for a murder conviction. He also acknowledged his guilty plea was his own free and voluntary act. With respect to establishing the factual basis for his plea, we acknowledge that occasionally Sanders' responses were confusing and required counsel to clarify with follow up questions. However, Sanders clearly stated that he stabbed Robinson multiple times, his co-defendant was not involved, and he was sorry for his actions.

[25] Second, Raff's testimony at the post-conviction evidentiary hearing also tends to establish Sanders' competence. Raff testified that Sanders communicated with him and understood what was going on. Their conversations were productive, and Raff testified, "This was not a situation where I felt that he . . . didn't understand the proceedings." [PCR] Tr., Vol. 2 at 29. Based on his

interactions with Sanders, Raff had no reason to question Sanders' competency. And finally, although Dr. Cates testified that Sanders performed low in every portion of the MacArthur tool, his performance in the reasoning portion, which "is the ability to understand alternatives and give a rationale for the reason for alternatives[,]" was better than the other portions. *Id.* at 9. This meant that Sanders was able to understand what information was relevant and needed to be provided to his attorney but "did not mean that he could then logically flesh it out or provide further information to an attorney to give detail or to give an understanding of how that information was useful." *Id.* at 10.[9] Dr. Cates also testified that he did not ask Sanders about his original murder case and therefore, he lacked specific knowledge about Sanders' understanding of the facts of the murder case.

[26] This evidence in the record tends to establish that Sanders was competent at the time he pleaded guilty, namely that he had the "ability to consult with his lawyer with a reasonable degree of rational understanding" and a rational and "factual understanding of the proceedings against him." *Godinez*, 509 U.S. at 396.

[27] Other evidence in the record does tend to show that Sanders was incompetent. There is no question that Dr. Cates' opinion that Sanders was incompetent

---

[9] Dr. Cates' written assessment revealed Sanders had the ability to reason, "or recognize relevance and evaluate alternatives. While this is essential to his ability to assist counsel, he demonstrated a concretized cognitive process" meaning he was able to distinguish relevant and irrelevant facts and accurately evaluate alternatives. [PCR] Exhibit, Vol. 1 at 228.

when he pleaded guilty, which was formed via a retrospective evaluation, supports this conclusion. Throughout Dr. Cates' testimony at the evidentiary hearing, he identified several "red flags" that supported his determination, including Sanders' poor performance on the MacArthur tool and his low intellectual ability. Sanders argues that the post-conviction court, in reaching its conclusion, "erroneously discounted this evidence and concluded that other evidence outweighed it[.]" Br. of Appellant at 21. He also claims the post-conviction court "discounted the significance of [his] performance on the understanding and appreciat[ion] portions of the MacArthur" tool and gave Raff's testimony undue weight under the law. *Id.* at 22, 26. But in essence, Sanders' arguments are a request for this court to reweigh the evidence, which we cannot do. *Fisher*, 810 N.E.2d at 679.

[28] Sanders asserts that *all* the evidence leads unerringly and unmistakably to the conclusion that he was incompetent when he pleaded guilty. Given the evidence in the record tending to show his competence, Sanders cannot meet the rigorous burden of demonstrating that the evidence leads unerringly and unmistakably to a conclusion that he was incompetent. Therefore, the post-conviction court did not err in reaching its conclusion.

## III. Ineffective Assistance of Trial Counsel

[29] Sanders claims the post-conviction court erred in concluding his trial counsel was not ineffective when he did not request a competency evaluation prior to allowing him to plead guilty and for failing to investigate and present evidence

of his mental conditions and disability as mitigating factors. We conclude Sanders has failed to meet his burden of proving ineffective assistance.

[30] The Sixth Amendment to the United States Constitution guarantees a criminal defendant the right to counsel and mandates "that the right to counsel is the right to the effective assistance of counsel." *Strickland v. Washington*, 466 U.S. 668, 686 (1984). Generally, to prevail on a claim of ineffective assistance of counsel a petitioner must demonstrate both that his counsel's performance was deficient and that the petitioner was prejudiced by the deficient performance. *French v. State*, 778 N.E.2d 816, 824 (Ind. 2002) (citing *Strickland*, 466 U.S. at 687, 694). A counsel's performance is deficient if it falls below an objective standard of reasonableness based on prevailing professional norms. *Id*. To meet the test for prejudice, the petitioner must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id*. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Perez v. State*, 748 N.E.2d 853, 854 (Ind. 2001). Failure to satisfy either prong will cause the claim to fail. *French*, 778 N.E.2d at 824.

[31] When we consider a claim of ineffective assistance of counsel, we apply a "strong presumption . . . that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Morgan v. State*, 755 N.E.2d 1070, 1073 (Ind. 2001). "[C]ounsel's performance is presumed effective, and a defendant must offer strong and convincing evidence to overcome this presumption." *Williams v. State*, 771 N.E.2d 70, 73

(Ind. 2002). Counsel has wide latitude in selecting trial strategy and tactics, which we afford great deference. *Ward v. State*, 969 N.E.2d 46, 51 (Ind. 2012). And isolated poor strategy or bad tactics do not necessarily amount to ineffective assistance of counsel. *Whitener v. State*, 696 N.E.2d 40, 42 (Ind. 1998).

[32] Here, the evidence Sanders presented at the post-conviction hearing does not lead unerringly and unmistakably to the conclusion that his trial counsel's performance fell below an objective standard of reasonableness with regard to investigating Sanders' competence or mental health issues. In support of his argument, Sanders points to the "red flags" retrospectively identified by Dr. Cates and the information contained in the memo to Raff. He contends that his "intellectual functioning is such that a reasonable attorney should have questioned his competency based on his interactions" with him and it should have been obvious to Raff that he was unable to understand the legal process or assist in his defense. Br. of Appellant at 29.

[33] Raff testified that he had no reason to question Sanders' competency or mental health. Although the information available to him indicated that Sanders had an eleventh-grade education, suffered from ADHD, could not read or write, received social security disability benefits, and told police he was mentally deficient, Raff was satisfied with the productive conversations he had with Sanders. Raff reasoned, "The fact that [Sanders] says he can't read, [and receives] public assistance may or may not be a factor [regarding competence], but they're not overwhelming factors. They're very common factors [and] it . . .

boil[s] down to does he understand what's going on here, not whether or not he's had a bad background or had some issues or some educational problems or . . . ADHD problems." [PCR] Tr., Vol. 2 at 32-33. He stated Sanders communicated with him and understood what was going on and therefore, he never questioned Sanders' competency.

[34] We note that the Chronological Case Summary indicates that Sanders appeared before the trial court at least seven times for various hearings prior to trial. *See* [Prior Case] Appellant's Appendix at 5-10. And there is no evidence in the record that Sanders' competency was questioned during those earlier hearings nor is there evidence that Sanders' competency was questioned in his previous encounters with the justice system. Aside from the note in the memo and the pre-sentence investigation report indicating that Sanders had ADHD and a learning disability, there was no evidence to indicate he suffered from any mental health issues. Ultimately, based on his interactions with Sanders and the evidence before Raff at the time, we conclude there was nothing to put Raff on notice that Sanders might need a competency evaluation or that he had a mental health condition that impaired his ability to communicate with his counsel or understand the proceedings. Therefore, Raff's failure to seek a competency evaluation for Sanders or present mental health or disabilities as a mitigating factor does not constitute deficient performance.

[35] Sanders has failed to prove by a preponderance of the evidence that Raff's performance was deficient in failing to investigate his competence and

therefore, we need not address whether Sanders was prejudiced. *See French*, 778 N.E.2d at 824.

# Conclusion

[36] The evidence presented at the post-conviction hearing does not lead unerringly and unmistakably to the conclusion that Sanders was incompetent at the time he pleaded guilty or that his trial counsel was ineffective. Therefore, the post-conviction court properly denied Sanders' petition for post-conviction relief. Accordingly, we affirm.

[37] Affirmed.

Crone, J., and Brown, J., concur.